Whitaker, Judge,
delivered the opinion of the court:
This case is before the court on Senate Resolution 115, 84th Congress, 1st Session, referring to us plaintiffs’ claims for a .report thereon, giving findings of fact and stating our conclusions on whether or not plaintiffs have legal or equitable *204 claims, and tbe amounts, if any, legally or equitably due from the United States.
The United States desired to purchase plaintiifs’ property for the Canyon Ferry Beservoir in Montana, to be created by the erection of a dam on the Missouri Biver. Negotiations were entered into, with the result that plaintiffs voluntarily sold their property to the United States, and executed deeds therefor. Plaintiffs now allege, however, that false representations were made to them to induce the sale of their lands, and that they were forced to sell at the prices offered by defendant through fear and duress.
The false representation alleged consists of a statement that the same price per acre would be paid for each parcel of land purchased; whereas, it is alleged, the price paid per acre for the various parcels varied greatly.
It is also alleged that the plaintiffs believed that the Government would not be guilty of offering them less than the fair value of their property and that, therefore, they assumed that the prices offered were fair, and in reliance thereon sold at the prices offered.
The duress alleged is the statements said to have been made by the agents of the Bureau of Beclamation, representing the defendant, if plaintiffs did not sell their property at the price offered, that the property would be condemned, requiring plaintiffs to pay large lawyer’s fees, which would largely consume the amount paid for the property, and that it would require many years, perhaps as many as 25, before they would ever get their money. It is also alleged that the Government offered to lease back to grantors land voluntarily sold, but would not lease back lands which it had to condemn.
Defendant denies the allegations of false representations and duress, and there is a conflict in the testimony as to the facts supporting the allegations, but, even if it be assumed that the facts alleged are true, it is apparent that plaintiffs have no legal or equitable claims against the United States. Plaintiffs were not minors nor mental incompetents, nor, indeed, untutored, simple men. They were intelligent, successful farmers and ranchers. They, better than anybody else, knew what their property was- worth, and they, better than *205 anybody else, knew whether the price offered by the Government was a fair price.
The fact that Government agents may have told them that the same price per acre would be paid for each comparable parcel purchased, if true, is not a misrepresentation of a material fact. What the plaintiffs were entitled to demand was the fair value of their property, and not the same price that their neighbor might be paid for his. If the Government happened to pay their neighbor more than his property was worth, that did not mean that the plaintiffs were entitled to demand the same price for their property. The plaintiffs were only entitled to demand the fair value of their own property.
It is conceded that the Government offered all the plaintiffs the appraised value of their properties, but plaintiffs say that the appraisals were not properly made and that their properties were not appraised at their fair value. The proof shows that the appraisers made an honest effort to properly appraise the various parcels; but whether the values arrived at were in fact the true values makes no difference. Plaintiffs were in the best position to know whether or not their property had been appraised at its fair value. If they did not think it had been, they were free to demand a higher price, and some of them did. Had they been minors or incompetents, the case would be different, but plaintiffs were intelligent, successful men, and must have known better than anyone the true present value of their lands. A number of them sold their properties only after consultation with their lawyers, although the majority did not do so. No effort was made to prevent them from consulting their lawyers or anyone else they chose to consult. So far as the evidence shows, no high-pressure tactics were used.
It is true that plaintiffs say that they were told that if they did not sell their properties to the Government at the appraised price, they would be condemned, and that in that event they would have to pay lawyer’s fees, which would eat up the amount awarded them, and that it would take many years, perhaps as many as 25, for them to get any money out of it. That they were told that, if they did not sell, their property would be condemned, was not duress. *206 This was a mere statement of the inevitable consequence of their refusal to sell. It was a frank statement of an intention to seek a remedy which the law gave. It is never duress to institute or threaten to institute civil suits where the threat to do so is made in the honest belief that a good cause of action exists. Automatic Radio Mfg. Co. v. Hazeltine Research, Inc., 176 F. 2d 799, affirmed, 339 U. S. 827; Du Puy v. United States, 67 C. Cls. 348; cert. den. 281 U. S. 739; Moseley v. Owensboro Municipal Housing Comm., 252 S. W. 2d 880 (Ky.); Roelvink v. Milwaukee, 79 N. W. 106 (Wisc.).
A party is always entitled to say that if his offer is not accepted, he will avail himself of his legal rights; it is only the threat of a wrongful or unlawful act that may constitute duress. Such a threat will amount to duress only if it is sufficient to overpower the will of the other party and prevent the free exercise of his will. Such a situation is not presented to us. It is, of course, true that the plaintiffs would need a lawyer in case condemnation proceedings were instituted, but it is silly to say that the lawyer’s fees would eat up any award that might be made; and it is equally absurd to say that it would take 25 years for them to ever get any money out of it. It is a reflection upon their intelligence to assert that they believed any such representations, if in fact they were made. If they were inclined to believe it, it was only necessary for them to consult their lawyers to learn that it was false. We cannot believe they were so gullible.
Now it does seem to be true that, for a few months after the defendant began acquiring these lands, it did give the grantors leases on the lands conveyed when they voluntarily conveyed them, but it did not give a lease to those whose property had to be condemned. (Later this policy was abandoned.) These leases were executed for a period up to the time that it was expected the property would be flooded, and were given at a low or perhaps a nominal rental. But whether or not such a lease should be executed was within the sole discretion of the Government. If the plaintiffs sold their property, the Government was entitled to do with it whatever it pleased. It could give the plaintiffs a lease or *207 not, as it chose. It bad the right to give a lease to those who voluntarily conveyed, and to withhold one from those whose property had to be condemned. It is not unnatural that the Govermnent was more generous to those who voluntarily conveyed than to those who put the Government to the trouble of condemnation. Naturally, the Government wanted to save the time and expense and trouble of instituting condemnation proceedings, and it may well be that the Government used this argument to induce voluntary conveyances. It was for plaintiffs to decide whether or not they were willing to accept the Government’s offer, coupled with a lease, or to reject it and take what they could get through condemnation proceedings, without a lease. They were completely free to do either one or the other; they have no right to complain of the choice they made.
We repeat: It is not duress for a party to do or threaten to do what it has a legal right to do.
Nor are we persuaded that the prices offered by the Government were substantially below the fair market value of the property at the time of the sale. The various properties were purchased over a period of some five years, and in that time there was great fluctuation in land values, due in part at least to the Korean War. The proof shows that the index of farm prices increased some 362 percent in the period during which these properties were being acquired. The result is that the Government did pay quite a good deal more for property acquired toward the end of the period of acquisitions than it had paid at the beginning. In all instances defendant undertook to pay landowners what it thought the current market value of their property was.
The period of acquisitions was spread over a long time because of a number of things, uncertainty as to the height of the dam to be erected, and, hence, the amount of property to be flooded, Congressional appropriations, etc. Much of the dissatisfaction has arisen from the fact that some landowners received more for their property than others, but this happened because of the increase in market value over the intervening years.
As an illustration of the fact that defendant paid a fair price for the properties purchased, we cite the instance of *208 Mr. Hardgrove’s property, one of the plaintiffs. Mr. Hard-grove owned a farm in Canton Valley, which was considered the richest farming area within the project. He was offered $159 an acre for the two tracts which he owned. One tract consisted of 60 acres, and the other of 38.9 acres. The 38.9 acres were appraised at $125 an acre. This was a part of a 320-acre tract of land which Mr. Hardgrove and his partner had bought from the Teague Estate in 1947, about two years prior to its sale to the Government. For this 38.9 acres Hardgrove and his partner had paid $78.25 an acre. In the same year in which the property was sold to the Government, Hardgrove bought out his partner’s interest in this 38.9 acres for $93.75 an acre. About sis months later the Government paid him $125 an acre. Mr. Hardgrove signed the deed after consultation with his lawyer and in his lawyer’s office.
The sale by Mr. Hardgrove is referred to because Mr. Hardgrove was one of the leading men in the community and had been instrumental in calling a meeting of the property owners to confer with Government agents relative to the sale of their properties.
We do not mean to say that the facts in his case exist in all other cases. Indeed, some of the other landowners in the reservoir area, who refused to execute deeds voluntarily, got considerably more as the result of condemnation proceedings than had been offered them. But whether or not this is so, the recitation of the Government’s dealing with Mr. Hard-grove shows that the Government agents were undertaking to deal fairly with the landowners, and their action in his case is by no means exceptional. We are convinced that in all cases they at least tried to act fairly.
The commissioner of this court has dealt in detail with each claim, and makes an ultimate finding in finding 139. In this finding he says:
Defendant paid the fair market value at the time of sale for the various properties bought from plaintiffs. Prices paid were also comparable as between plaintiffs to the extent of sales made at or about the same time for similar lands. Plaintiffs were offered the full appraised price set after appraisal by qualified agents of defendant. * * *
*209 He also finds that there was no misrepresentation of material facts, and that the parties executing deeds were not acting under duress. We think the facts found in his report and the evidence introduced fully support these conclusions. We agree with and have adopted his findings, including his ultimate finding.
We conclude, therefore, that plaintiffs are not entitled to recover either at law or in equity. Whether or not anything should be paid them as a gratuity rests, of course, within the sole discretion of Congress.
This opinion, together with the findings of fact, which follow, will be certified to the Congress pursuant to Senate Besolution 115,84th Congress, 1st Session.
McLaughlin, District Judge, sitting by designation; Madden, Judge; and Jones, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. On January 10, 1955, Senate Bill 175 was introduced into the 84th Congress, 1st Session, which bill was entitled: “A bill to provide for the relief of Milton Beatty and others by providing for determination and settlement of certain claims of former owners of lands and improvements purchased by the United States in connection with the Canyon Ferry Beservoir project, Montana.” The bill was favorably reported by the Senate Judiciary Committee on June 7,1955. Thereafter, on June 20, 1955, Senate Besolution 115, 84th Congress, 1st Session, was passed, providing as follows:
Resolved, That the bill (S. 175) entitled “A bill to provide for the relief of Milton Beatty and others by providing for determination and settlement of certain claims of former owners of lands and improvements purchased by the United States in connection with the Canyon Ferry Beservoir project, Montana”, as reported by the Committee on the Judiciary of the Senate, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the Court shall proceed with the same in accord- *210 anee with the provisions of sections 1492 and 2509 of Title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
2. Plaintiffs are either former owners or the former owners of partial interests or the representatives of the estates of former owners of certain lands, which, together with the water rights and improvements, were acquired by the United States, acting through the United States Department of Interior, Bureau of Reclamation, on various dates, for use in connection with the Canyon Ferry reservoir project in Montana pursuant to authority of Congress. The claim of each plaintiff is taken up separately in subsequent findings where a description of the lands in question is given together with dates of contract of sale to the Government. Legal descriptions stated in the petition are adopted by reference. Plaintiff Charles P. Hadcock was not a party to the trial of this action and was dropped therefrom by stipulation of the parties. All of the plaintiffs are citizens of the United States. No action has been taken upon plaintiffs’ claims in Congress or in any department or any independent establishment of the United States Government except as set forth herein. Plaintiffs have made no assignments of their claims.
3. The first public information about the possibility of the Canyon Ferry dam in Broadwater County, Montana, was contained in a newspaper article in the Townsend, Montana, /Star of May 21,1942. The article stated that steps to start construction of the dam costing in excess of eleven million dollars had been approved by the Commissioner of Reclamation, that the first appropriation would be used to purchase rights-of-way and to complete engineering studies, that it was proposed to rush construction of the dam as an emergency war measure to provide power for certain mineral developments under supervision of the War Plants Board, that the dam would create a reservoir of 1,980,000 acre-feet of water extending 27 miles in length, that it would be useful fór irrigation purposes and would have a power installation *211 that would produce 35,000 kw. hours of electricity. The Canyon Ferry project was authorized in December 1944. At about the turn of the century a smaller dam was constructed at Canyon Ferry by a private power company. Consideration was given from time to time by the company to raising the level of this dam and flooding additional lands. Surveys were made for the purpose and litigation resulted from dam operations and flooding of lands.
4. The majority of the plaintiffs herein lived in Canton Valley within the reservoir area. The property in this valley had been held, to a large extent, by the same families for more than one generation. Ancestors of some of the plaintiffs had homesteaded their property and other plaintiffs held title to land their forebears had purchased from the original patentees. Water rights under the Montana and Yankee ditches were ample and the irrigation cost low. Soil, for the most part, was productive. Plaintiffs enjoyed a comfortable standard of living and did not want to part with their land. Sales were infrequent, a subject discussed later in more detail. The possibility of flooding by the proposed new reservoir also discouraged sales.
5. In 1949 the Commissioner of Reclamation, en route to Helena, Montana, was asked to appear before a meeting of local citizens at Townsend to explain acquisition procedure for the Canyon Ferry dam. He did so and advised those present that the land to be acquired for the project would be appraised by three competent appraisers and that the landowners would be offered the full appraised price. Subsequently, plaintiff W. R. Hardgrove, an influential rancher in the community, went to the dam site and requested of William Price, the engineer in charge of construction, that the plans for the future project be explained to the landowners affected by it. Accordingly, a meeting was held on April 10, 1949, at Townsend, Montana. It was attended by Walter M. McCormick, regional land officer, U. S. Bureau of Reclamation ; William P. Price, Jr., construction engineer of the project, and Gordon K. Ebersole, assistant to the construction engineer, representing the defendant. The meeting, for convenience, will hereafter be referred to as the McCormick meeting.
*212 6. Mr. Ebersole made a detailed memorandum for the construction engineer of what transpired at the aforesaid meeting. It was dated April 20 but was based on notes he made at the meeting. This contemporaneous record of the meeting, which is in evidence, discloses that those present were told by McCormick that the construction engineer was to determine the land which it would be necessary to acquire. When the regional director was advised thereof, the regional land officer would send out appraisers to give a fair and impartial appraisal of the land in question. Mr. McCormick explained that the instructions to the appraisers were very explicit and that the rights of landowners, as well as the interests of the Government, would be well guarded. Mr. McCormick advised those present, including most of the plaintiffs in this case, that the appraisers go into the market value of the land by checking sales in the vicinity during the time the appraisals were being made. He further explained that all land in the United States was subject to the right of eminent domain, or, in other words, that the Government had the right to condemn it. Mr. McCormick stated further that ownerships in excess of $50,000 in value had to have the approval of the Commissioner of Reclamation. One year’s possession after date of transfer of title to the United States, subject to the needs of the construction, would be given to those who sold to the Government. The procedure of a friendly condemnation suit to declare title was explained. Ranchers were told that appropriations to purchase lands were limited but that the big operation to acquire land would start in July 1950. It was the policy of the Government to leave the land in production as long as possible and leases could be negotiated after the title was transferred to the United States.
In answer to inquiries from the audience, Mr. McCormick advised that an appraisal would be adjusted up or down as economic conditions warranted. A complaint was expressed to the Government representatives that a delay in purchase of the lands in question created difficulty for the landowners, because they could not sell it at current high prices, and that there was danger that the lands would decline in value due to historic postwar factors. The ranchers were assured *213 that prompt action would be taken to make a survey which would indicate the area required for the reservoir, so they could know what part of their land was affected. The question of severance also was raised. Mr. McCormick explained that if severance damage amounted to anything near 100 percent, the Government would buy the whole parcel instead of part of it. Also, a landowner would be given a choice of selling all of his land or keeping part of it with severance damage. Mr. McCormick was asked to explain in detail the procedure of how acquisitions would be handled from the time of the commencement of negotiations to the transfer of title. He did so. Mr. McCormick assured his listeners that the full appraised value would be given to each rancher at the time negotiations began except for the consideration for retained improvements. Mr. McCormick explained that the appraisals would not be made upon the basis of the amount of income the property would produce as contrasted to the type of land it involved.
The so-called McCormick meeting proved to be a very important factor in influencing subsequent action of plaintiffs. Many of the plaintiffs and their witnesses recalled that Mr. McCormick stated there would be but one price paid for one grade of land. The minutes of the meeting do not reflect that this was so stated and Mr. McCormick denied it on trial. Plaintiffs, however, uniformly testified that they received such an impression.
7. Mr. McCormick, the regional land officer, on December 15, 1949, restated his views about appraisals in a letter to plaintiff W. G. Kirscher of Townsend. His letter reads in pertinent part :
At a meeting held in Townsend which you attended, I explained our acquisition policy, and if you recall, some of the people expressed their views that all landowners should be given an opportunity to sell their land if they so desired, in case land values should take a drop. I explained that due to certain restrictions in the Appropriation Bill, it was impossible to buy land in the upper area, but did agree that the landowners should be given this opportunity. As a result of many such requests I was successful in obtaining authorization to purchase any parcel in the reservoir area, and all owners will be given an opportunity to sell at the ap *214 praised value. I do not recall making the statement that we would start at the dam site and buy upstream in an orderly way, although that is the normal procedure and is followed as close as practical.
It is the policy of the Bureau of Reclamation to pay full fair market value for property acquired, and as I stated at the Townsend meeting, the landowners would be offered the full appraisal less a consideration for being allowed to remove or salvage improvements and to retain possession of the property for one year from the estimated date of execution of the warranty deed. If the owner wishes to relinquish possession upon execution of the deed and does not wish to retain the improvements, he will be offered what in the appraisers’ opmion is fair market value.
In making appraisal of a stock operation, the entire operating unit is taken into consideration. The carrying capacity of the unit before taking and after taking is estimated, and in estimating the carrying capacity, forest permits, Taylor grazing, State leases, and private leases are included. Livestock water, winter quarters, shelter, location, market, operating costs and other factors having a bearing on fair market value are thoroughly investigated by the appraisers in arriving at a fair market value. The appraisal is made on a before and after taking basis, and the difference between the two values is the appraisers’ opinion as a fair market value. Fair market value is not necessarily the summation of the individual items.
I agree with you that the farmers and ranchers in an acquisition area are entitled to all the information which it is possible for us to give them. It is my desire to satisfy all landowners by paying a full fair market value, and I believe that our appraisals are on the generous side. If we make an inadequate appraisal and substantiating facts indicate that the appraisers have overlooked something affecting fair market value or erred in their opinion, we want to and will correct the appraisal. We will not raise the appraisal to meet asking prices.
Most anyone can pick an appraisal to pieces on individual items, and as I stated before, the summation of the items does not necessarily reflect fair market value. If we were to make the appraisal reports available to the landowners, an argument would follow on every item, and negotiations would become too complex. We attempt to purchase land the same as you would buy from another individual, and I am sure *215 that you would not make a separate offer for fencing, for the dwelling, the outbuildings, and so much per acre for this type of land and so much per acre for other types of land. An offer to buy or sell is generally made either on a per acre price, or a total price for the unit.
I will gladly give you or any landowner all the information possible concerning our acquisition. Please do not hesitate to request additional information.[1]
8. Several employees of the Bureau of Beclamation took part in acquiring the lands involved in this case and participated at the trial. Their activities in connection therewith will be referred to more fully hereafter. The individuals are:
(a) W. N. McCormick, chief of the appraisal and acquisition work for Begion 6, which consists of eastern Montana, northern Wyoming, the Dakotas and parts of Iowa and Minnesota. Mr. McCormick had to approve all of the appraisal reports for land to be acquired. He has had extensive experience in acquiring reservoir areas for the Bureau of Beclamation over a period of 11 years.
(b) Bert Waddell went to work for the Bureau in 1947 after a long career as a rancher, banker, president of the Federal Land Bank in Omaha, and Government employee.
(c) Thomas B. Virden was employed as a Bureau of Bec-lamation appraiser in 1948 after a career as a rancher and loan appraiser for a bank in Douglas, Wyoming, the latter work starting in 1928.
(d) Andrew Sathe went to work for the Bureau in 1947 as a land appraiser after extensive prior experience in the same field since 1933 with the Federal Land Bank, a private bank, the Department of Agriculture, and as a rancher. He is a member of various professional associations and, like the others mentioned above, well qualified in his field.
(e) Vernon George was in the ranching business for 21 years before going to work for the Department of Agricul *216 ture as an appraiser in 1935. He was on loan to various Government agencies and in 1944 went to work lor the Bureau of Eeclamation. He qualified as a negotiator and as such his authority was limited to offering the appraised value set by others on land and improvements. In his capacity he has contacted several thousand people. He contacted plaintiffs in this case but did not appraise any of the property involved nor did he have any right to negotiate a sale other than to accept an offer based on an appraisal given to him by his superior, Mr. McCormick. He characterized his function as that of an “errand boy.”
(f) Gordon Ebersole, previously referred to as assistant to the construction engineer on the Canyon Ferry project, is a registered engineer who has been with the Bureau of Beclamation for 21 years. His duties also included public relations work in connection with the project.
9. A team of four professional appraisers started in April 1948 to make appraisal of the lands to be acquired in connection with the Canyon Ferry dam. They were interested in production records in order to establish production for a “typical farm.” A composite plan for a hypothetical operation was based on sales, production, information gained from farmers in the locality, soil maps, and published figures relating to crop yields and prices. Defendant’s appraisers did not ask each of the individual plaintiffs for production records, operating costs, or tax returns and had no interest in evaluating their correctness. Tenants and landowners were contacted but the evidence conflicts as to whether this was done in each case. Eight years after the appraisals were made some of the plaintiffs did not recall seeing the appraisers. The appraisers, however, were instructed to contact the owners or tenants, inspect the property personally, and submit written appraisal reports for approval by their superiors. These reports are in evidence and describe the type of land by soil type, topography, its best use, number of acres, valuation, description of improvements and general information respecting location as to schools, roads, farm services, markets and irrigation, together with other pertinent information such as assessed valuation, classification and taxes. De *217 fendant’s appraisers testified that it was not their desire to evaluate management which sometimes is reflected by production records and operating costs. Defendant concedes, however, that these elements have a bearing on fair market value. In determining such value, defendant gave less weight to an individual plaintiff’s production record, where known, than to a hypothetical farm operation on a “typical farm” as determined by its evaluation of numerous factors enumerated above. As to capitalization, this theory of valuation was regarded as useful only as a check against other methods.
10. In addition to the foregoing, defendant’s appraisers sought to establish fair market value for the land to be purchased by comparing it to sales believed to be reasonably comparable and within the project perimeter or within close proximity to the lands involved in this case. The sales defendant relied upon are as follows:
(a) Plaintiff Herb Gill in March 1944 bought from C. N. Burgess the 160 acres on which Gill had been a tenant for 14 years. The price was $20,000 and included an old eight-room house. This was an average of $125 per acre. Defendant’s agents talked to Mr. Gill and saw his property.
(b) Plaintiff W. G. Hardgrove, in partnership with a Mr. Kane, in 1947 bought 320 acres of land from the Antoinette Teague estate for the sum of $25,200. Approximately one year later Hardgrove bought out his partner’s interest for $15,000. The first sale would average $78.25 per acre and the second $93.75. Part of the land was acquired for the Canyon Ferry project. Hardgrove testified that the land was overgrown with weeds when originally bought but that, aided in part by $1,206.95 in Federal soil conservation payments, it was restored to production. Defendant’s agents saw the property and talked to Mr. Kane, as Hardgrove was busy.
(c) Plaintiff Neild bought approximately 280 acres in April 1948 at a sheriff’s sale to settle the Keenan estate. The Neilds had lived on the property as tenants for seven years prior to the sale which was for $10,000. The sale had been advertised. Neighbors did not bid against the Neilds, either out of friendship or lack of knowledge of the sale. The *218 aYerage price per acre paid by plaintiff was $35.71. Defendant’s agents talked to Mr. Neild and saw this property.
(d) Otto Bilquist in April 1948 bought 244 acres from Francis Shannon at $50 per acre. Mr. Waddell saw this property and talked to Mr. Bilquist.
(e) Henry Meyer bought 494 acres from Lawrence Zimmerman for the sum of $52,658.56, for an average of $106.60 per aore in March 1947. Meyer sold to H. Vance Pope, in October 1948, the 300 acres of his land which were above the Montana ditch for $31,341.44, or $104.50 per acre. Meyer testified that he regarded the part he sold as worthless because it was dry and rocky, although at the time he bought it he figured it was worth $20 per acre. Mr. Waddell talked to Mr. Meyer. It is not established whether he or his colleagues talked to Pope or Zimmerman.
(f) In May 1947 Am azi ah Johnson sold 280 acres to H. C. Plymale for a consideration of $10.57 per acre. Mr. Wad-dell was on this property and talked to Johnson and Plymale.
(g) There were various other sales, some not in Canton Valley but in the county, to which defendant’s agents attached importance. The records of these sales were found in the courthouse. These included a sale by Wilbur Merritt to W. Glenn Kirscher in January 1947 for $90 per acre. Defendant’s agents did not discuss this sale with the parties.
(h) There was a sale in 1944 from Lodge to W. J. Gaab of 240 acres for $8,500, or between $35 and $36 an acre. Mr. Waddell talked to Mr. Gaab and examined the property. This land was admittedly not as good as Canton Valley land and was without improvements.
(i) Howard Doggett sold to DeHoog Eanch, Inc., 7,900 acres for $45,000 in 1947, or $5.70 per acre. DeHoog sold this land plus 8,520 acres to Gilbert Schultz in 1949 for $104,500, or $6.36 per acre. Six hundred thirty acres were irrigated. The owners estimated that the land would support 500 animal units for a full year which would equal $209 per animal unit. The land was in Broadwater County. Mr. Waddell and Mr. Virden inspected the property and Virden talked to Schultz and Doggett.
(j) H. C. Eogers sold 1,917 acres in March 1949 to Charles Mazola for $50,000, or $25 per acre. The place was partly *219 irrigated and was regarded as capable of supporting 225 animal units which, equals $222 per unit. The sale price on this property, however, was actually fixed in 1946 when an option was entered into for the purchase at this price at the end of a three-year lease. Mr. Waddell saw this property and talked to Mr. Mazóla, as did Mr. Yirden.
(k) Clarence Dallas sold 727 acres for $22,500, or $81 per acre, in February 1951 to Bert Cobban. This was a small integrated ranch used as a dairy farm and capable of supporting 90 animal units for a full year, or $250 per animal unit. Mr. Waddell saw this property and talked to Mr. Dallas.
(l) Horace Little, in March 1952, sold 5,592 acres to Leonard Wing for $100,000, or $17.88 per acre. The land was considered capable of sustaining 500 animal units the full year which equals $200 per animal unit. The land ran along the Missouri River for about four miles and 1,000 acres of it were irrigated. Mr. Waddell inspected this land and talked to Mr. Wing.
GEORGE H. CHRISTIE ESTATE [2]
11. The first plaintiff called upon by defendant’s negotiator, Mr. George, was George H. Christie who, with his *220 wife, Ruby, sold to defendant on September 17,1949, 434.36 acres in Broadwater County, Montana, tbe legal description of the land being set forth accurately in the petition. The sale price was $4,260. Plaintiff was allowed to retain possession until March 1, 1950, and to harvest his crops.
Mr. Christie and his wife are deceased and their son, Douglas T. Christie, is the executor and testified in this case.
Plaintiff claims the fair market value of the land sold to defendant was $20,440. The difference between the sum claimed and that which was paid amounts to $16,180, which is claimed here. This would be at the rate of $47.09 per acre. Plaintiff’s son and executor knew of no land in the area selling for any such price in 1949. However, the claim is modified by the testimony of plaintiff’s expert witness, H. S. Hibbard, a Montana rancher, businessman, appraiser and graduate of Harvard Business School. Mr. Hibbard stated that $8,680 represents the value of the land sold and $11,760 is for severance damage. This valuation of the land sold is $20 per acre. Defendant paid an average of $9.82 per acre. The land sold was unimproved, uncultivated pasture of wild grass. Plaintiff owned another property, 160 acres, referred to as the home ranch six miles away where he lived near his son, Douglas. They were approximately 21 miles from Townsend and 30 miles from Helena. Plaintiff also owned mountain rangeland 25 miles from the home ranch and leased 750 acres adjacent to the home ranch.
Adjacent to the land purchased from Christie was land which he leased and operated as a unit under the same fence. Of the leased land, 1,395 acres belonged to the State and 640 acres to the Northern Pacific Railroad. Together with plaintiff’s land, 2,469 acres were thus operated by him at this location. After the creation of the reservoir the total number of acres was reduced to 1,349 because 686 acres of the leased land were also purchased by defendant and inundated. The remaining land leased by plaintiff was high pastureland of a value estimated by plaintiff’s qualified expert at $10 per acre. This upper land was covered by a native grass known as Gramma grass which is late maturing. When cattle were brought from the home ranch, where wintered, down onto the 434 acres and the leased land, they were first turned in *221 on the bottom land where there was a more lush growth suitable for grazing and later, about June, could be moved up higher. In the fall when high pasture was no longer available they could be moved down again to the bottom land and unfenced islands in the river where there was grass. They could graze until the middle of November before being returned to the home ranch for winter feeding or for marketing. There was a valued spring on the leased State land near plaintiff’s land. Loss of the 434 acres, 45 or 50 of which were alleged to be bottom land along the river, is thus regarded by plaintiff as a loss of land vital to proper operation of the ranch. Plaintiff’s expert estimated that 147 animal units could be maintained on the total area (deeded plus leased lands) before the sale and flooding and only 106 subsequently, a loss of 41 animal units.
Plaintiff’s expert based his opinion on what he described as “available records of the production.” The ranch was flooded prior to Hibbard’s investigation. He stated that the reduction in the acreage resulted in a real estate tax reduction and an interest charge reduction on the 41 head of cattle but it did not reduce management costs. Plaintiff’s expenses were reduced by an estimated $446 and his income by $2,700, for a net reduction of $2,254 in annual income, assuming the lost acreage could not be replaced and assuming a fairly constant price level for cattle. There is no evidence showing that similar lands could or could not have been found with a water frontage and grass to replace the acreage bought by defendant. Hibbard put a capitalized value of $22,540 on the ranch. The figure of 10 percent was used in doing so because of the high degree of dependency on leased land for a successful operation.
12. Defendant’s appraisers, Waddell and Virden, saw plaintiff at his ranch in December 1948 at which time inquiry was made as to how his land was being used and what lands he had. It was the opinion of Douglas Christie that no appraiser ever talked to his father at any time, for it was not mentioned to him nor did he see any appraisers himself. However, the weight of the credible evidence is that in July 1949 defendant’s negotiator, Mr. George, submitted an offer to plaintiff in the sum of approximately *222 $3,760 based on an appraisal by Waddell. Plaintiff objected to this as insufficient and asked for a reappraisal which was completed on August 24, 1949. This appraisal, which is in evidence, is signed by appraisers Sathe and Heisler. It states that of the 434.36 acres concerned, 400 consisted of grazing upland, 23 acres of river bottom pasture and 11.36 acres of wasteland washed away by the river. The 400 acres were valued at $3,200 and the 23 acres at $460. This amounts to $8 per acre for the 400 and $20 per acre for the bottom land. To this valuation was added the sum of $600, representing one mile of Missouri Biver frontage of great use to the livestock, for a total valuation of $4,260. The land was further described by defendant’s appraisers as being 21 miles from Townsend, as having a school bus three miles east which went to that city, as being on a dirt road and 16 miles from a paved road, and as being without phones, mail service or electricity. Market facilities were listed as at Townsend or at Helena, the latter 28 miles away. The land was not irrigated. The report stated that the 434 acres represented an important part of an extensive operation and quoted the owner as stating that his outfit could take care of 250 head of cattle the year around. The report stated, under the heading “Severance Damage”, the following:
No severance damage allowed. Taking the entire ownership in this location. This taldng is a key place to control about 3 sections of leased land because it has the only water that can be used for livestock.
13. Plaintiff has represented that the leased land which was not flooded is only a “cactus flat,” high up and away from the river. It is still being used in the spring for a short period of time. Plaintiff’s valuation of the entire 434 acres, as noted above, was on the basis of $20 per acre which was the' sum allotted by defendant only to the river bottom portion of 23 acres, as the balance of that tract was stated on the appraisal report to be “sandy and gravelly, gently rolling grazing upland” whereas the bottom land was silty loam. The evidence establishes that the portion of the 434 acres other than the bottom land was in no category different from other grazing uplands and that its value was not less than *223 the $8 per acre accepted by plaintiff, nor more than $10 per acre as estimated by plaintiff’s expert for similar land. It is not disputed that the portion of the leased lands purchased by defendant was for $7 to $8 per acre. Defendant’s appraisers were able to see plaintiff’s land and did see it before it was inundated to determine its nature. Plaintiff’s appraiser could not see it.
The value of the tract sold was largely in its relation to the leased lands from which it was severed by defendant’s purchase. The terms of the leases held by plaintiff are not established by the evidence. Plaintiff’s son testified that the State lease was for ten years but there is no evidence when it started to run or if there was any right to renew. Plaintiff’s expert and appraiser treated the lease as being held in perpetuity. There are no facts in evidence with respect to the lease from the railroad.
14. Defendant’s appraiser, Sathe, offered evidence of three alleged comparable sales ranging from $3.27 to $7 per acre for grazing land in 1947 and 1948. With one exception the location of these lands was not given nor an adequate description thereof. It is found that such evidence is insufficient as a basis of appraisal of plaintiff’s property. Sathe said he had 12 comparable sales which he considered. They are not in evidence. He also relied on capitalization. The elements he considered were not stated. The weight of other evidence, however, supports the sale price as being the fair market value at the time of sale. Defendant offered no evidence as to severance damages, as it takes the position such are not allowable as a matter of law and contends that plaintiff has in any event made a wrong computation thereof based on leased as well as deeded lands. If, as a matter of law, severance is allowable, on the basis claimed by plaintiff, then the plaintiff’s estimate of $11,760 is reasonable.
15. Plaintiff’s son and executor testified that plaintiff was told in his presence by defendant’s negotiator that if he did not accept defendant’s offer the land would be condemned, that such a procedure was costly and he would get less in the long run because court costs and lawyers’ fees would eat it up and, further, that it would take from 10 to 20 years before the case was completely through the courts. *224 He stated that he and his father understood that this meant they would not get any money for their property until this time expired, and that this alleged representation was accepted at face value because it came from an agent of the Government. For these reasons, Douglas Christie said plaintiff accepted defendant’s second offer. The son’s wife supported his testimony.
The allegations above are denied by defendant’s negotiator. On the occasion of the second visit of this negotiator, which resulted in the contract of sale in September 1949, Gordon K. Ebersole was the notary. Douglas Christie was not present. The weight of the credible evidence is that plaintiff did not sell under duress or as the result of any representations which could not be verified or which were calculated to mislead the seller.
GEORGE MILTON BEATTY
16. The second plaintiff called upon by defendant’s negotiator was Milton Beatty. Mr. George, in company with Mr. Ebersole, saw Beatty on March 1, 1949. Beatty’s asking price was $45,000, which would be at the rate of approximately $102 per acre, so defendant’s agents made him no offer, not being authorized to go so high. There was discussion about the farm and the number of cattle it would carry and George told plaintiff that he would return at a later date. A new appraisal was made on August 22,1949, by Sathe and Heisler who had appraised the Christie estate nearby. This appraisal was approved by the regional land officer, director and counsel, respectively, in September. Mr. George offered Beatty the amount of the appraisal which was $35,677.25, or $2,000 less if plaintiff wished to retain the improvements. This offer seemed low to plaintiff and he asked what would happen if he did not accept it. He was advised that the property could be condemned, that this procedure might take considerable time and plaintiff might not get as much as he had been offered. The. prospect of litigation and delay was not pleasing to plaintiff either and he expressed a desire to consult with his attorney about the situation and did so. Defendant’s negotiator, George, met Beatty at the office of the latter’s lawyer on September 20, 1949, and a contract of *225 sale was signed by plaintiff and his wife, Ruth, at the appraised price. Plaintiff now claims $39,651 was the fair market value and seeks the difference of $3,974.50.
17. It was determined that plaintiff’s title was defective and a friendly condemnation would be required. Accordingly, consent of plaintiff was secured and it was agreed that plaintiff could remain in possession of the land being acquired until March 1, 1950. In the meantime plaintiff sought another place to live. He inspected many properties which he regarded as unsatisfactory and not comparable to what he had agreed to sell. Finally, in 1952, plaintiff bought 200 acres near Roberts, Montana, for $33,000 and claims to have spent $7,000 additional on it. The war in Korea had started in the interval between the sale of the land here in controversy and the purchase by plaintiff of a new ranch. Plaintiff remained on his original property under lease with the defendant until his move. Defendant asked $800 for the lease which was later reduced to $500 and ultimately to $300.
18. The legal description of Beatty’s property is set forth in the petition. It consisted of 437.85 acres on lower Beaver Creek near the Missouri River in a narrow valley bounded by rough hills. The 437.85 acres constituted the winter pasture and base of operation for a ranch consisting of 2,375 additional acres of grazing land. The ranch was in Broadwater County, Montana, within five miles of Winston, on a good road and with phone, running water, and electricity. There was a school nearby. Helena was 20 miles away. Plaintiff had an ample water right out of Beaver Creek and owned a spring that never froze. Defendant’s appraisers described the ranch in part as follows:
This is a better than average ranch for the community and is about as nearly self-sufficient as any in the neighborhood, in producing Cattle, Sheep, Hogs, oats, barley, alfalfa hay, gardens, etc. This is said to be the first ranch established on Beaver Creek and dates back to 1860. And it has remained in the hands of the family since which is a good record of stability and productivity of the ranch as well.
Owner classifies this ranch as a 200 head outfit, but has on occasions had more. He has now a large amount of hay and grain, principally livestock feed. He can and *226 does spread water on all bis land except a small portion in the hills on north side of ranch.
Defendant allowed $16,292 for the land purchased, $4,-750.25 for severance, $13,475 for buildings, $200 for wells and $960 for fences. The property lay along the river and consisted of 235 acres of cropland and 202.95 acres of sub-irrigated pasture. Plaintiff cultivated 45 acres and the rest was in native hay. The pasture was valued at $20 per acre and the irrigated cropland at $35 to $75 per acre, depending on its nature. There was a modern house, a good barn and several sheds, 18 buildings in all. As to severance defendant’s agents stated:
The taking area embraces the entire winter pasture, natural shelter and buildings and irrigated land belonging to the unit. We are leaving 2,375.15 acres of fair to good grazing land which wo value at $6.00 per acre average, to the unit as now constituted. The 17. S. Forest Permit for 58 head of cattle for four months will not be lost at once to the owner by reason of ownership of the remaining grazing tract, but eventually he would have to acquire a winter base in order to make use of it. Pasture land is readily saleable and obtainable now in this area and probably will be when the Canyon Ferry Dam is completed. We believe a severance damage of $2.00 per acre, or the sum of $4,750.25 is the extent to which the market value of remaining lands is reduced by this taking.
19. Defendant’s appraiser, Mr. Sathe, testified that he spoke to plaintiff. Plaintiff did not recall it. Plaintiff did recall the first appraiser who visited his property. Sathe admitted that he did not ask for plaintiff’s production records or operating expenses, but only asked to move about the premises without trespassing. He did inquire about plaintiff’s leases. In determining fair market value, however, defendant’s appraiser used the capitalization theory at a rate of seven and one-half percent, based upon information as to production which was secured from agricultural reports on the Canton Yalley giving averages. It was his position that this was more reliable than could be received from plaintiffs themselves and that such statistics eliminated, for the most part, the variable factor of management. He con- *227 eluded that this was the best approach based upon 25 years of appraisal experience.
Defendant’s appraisers relied, also, in the Beatty case, upon two sales they regarded as comparable. One of these was the sale on August 19, 1946, by the J. P. Ranch Company to B. A. and G. K. Smith, Helena, Montana, for a sale price of $60,000 at $19.51 per acre for 3,075 acres. This ranch was described as having extensive improvements valued at $22,172, a good water right and forest permit. Like the Beatty ranch it was a hay ranch, but a larger operation which would carry 356 head of cattle, including 105 on a forest permit.
The other sale was from H. C. and Virginia T. Rogers, Bozeman, Montana, to Charles Mazola, Winston, Montana. The sale price was $50,000 for 1,917 acres, or approximately $25 per acre. The sale was on March 4,1949. This, too, was a hay ranch with an adequate set of buildings valued at $15,000. These two ranches each had irrigated as well as dry land. There was no objection by plaintiff on the receipt into evidence of the data about these two comparable sales. All three of the properties were described as on Beaver Creek within four miles of one another. Plaintiff Beatty received more per average acre than the other two owners, not considering severance and improvements. Plaintiff received $48.75, the Ranch Company $30.67 and Rogers $32.33 per acre. Plaintiff’s expert, Hibbard, did not agree that the sale by Ranch Company to Smith was comparable as he said the water right was poor and that it was necessary to buy hay for the cattle on this ranch whereas Beatty was able to sell hay. He was not very familiar with the Rogers’ ranch.
20. Plaintiff Beatty testified that he had not attended the so-called McCormick meeting but thought the Government had treated him fairly in the sale. He changed his opinion after he got out and tried to buy another place. He further felt misled by the defendant’s agent who told him that he might get less if he went into court and that it would take a long time to do so. Upon coming to these conclusions he hired Mr. Hibbard, a qualified appraiser heretofore referred to, who testified as the expert for plaintiffs *228 in this case. He admits that his own initial valuation of $45,000 was just for bargaining purposes and now stands on the appraisal of his expert. Mr. Hibbard did not see the property before flooding and got his information about it mostly from plaintiff Beatty and his neighbors. He saw the land which was not flooded and was familiar with the Beaver Creek area. Hibbard put no valuation on the improvements which he did not see. He saw pictures of them and considered them fully depreciated. The hillside pasture he A^alued at $14.75, or over twice what defendant valued it, and pointed out that it sold in a private sale about two years after plaintiff sold part of his ranch to the defendant. The sale of this additional land was for $32,746, which was $3,571 less than the valuation of $35,746 placed upon it by Hibbard, but $18,496 more than defendant’s valuation. Accordingly, he made an allowance of $3,571 severance damage to plaintiff.
The acreage which plaintiff sold to defendant was valued by Hibbard at $39,651. He stated: •
We valued the home ranch, which was the part that was taken, by its contribution to the unit, valued the entire unit, valued this portion of it by its contribution, and valued the forest permit and the hillside pasture on the same basis.
21. Hibbard valued plaintiff’s acreage as follows: 45 acres of cropland at $100 per acre for a total of $4,500; hayland at $100 per acre for 200 acres, a total of $20,000; 193 acres of grazing land at $60 per acre, a total of $11,580; $3,571 for severance as noted in the preceding finding; a grand total of $39,651 for the 437.85 acres, or $82.37 per acre, without severance.
Hibbard valued plaintiff’s entire holdings at $70,900 which includes $5,800 for the forest permit plaintiff held.
Using the animal unit basis of valuation and assuming plaintiff’s tract would support 217 head of cattle valued at $300 per animal unit, Hibbard said the valuation would be $65,100. The home ranch contributed 54 percent of the operation of the grazing which would be equal to $35,154 at $80.26 per acre for the tract sold to defendant. The hillside and forest would thus be the remainder or $35,746, *229 noted in the preceding finding. To this Hibbard adds his valuation of the forest permit. The evidence about the number of animal units averaged by plaintiff is conflicting. He told defendant’s appraisers 200 to 225. He told Mr. Hibbard 217 and testified at the trial that he averaged 170 head. In conversation with George and Ebersole he used the figure of $200 per animal unit instead of the $300 used by Hibbard. There is no explanation in the evidence of the differences. The weight of the evidence indicates that $200 per unit for 225 head, which equals $45,000, is too high for Beatty admitted this was an asking price made for purposes of negotiation. Hibbard’s figures, therefore, are found to be excessive, computed on 217 head at $300 each.
22. A forest permit as described by Hibbard has stability and continuity and is of great value to ranch property. Such a permit allows the holder to graze his cattle on Government land at the proper season for a cost generally less per acre than an ordinary lease of State or Federal lands. Such a permit can be transferred with the land if approval is given by the Federal authorities. Such a permit can be canceled or the land covered by it can be withdrawn from use. Plaintiff did not himself place a dollar value on his forest permit. Plaintiff did not lose his permit by virtue of the sale to the defendant. It is not established whether it was sold when plaintiff disposed of additional lands later, as described above.
23. Plaintiff’s relations with defendant’s agents were entirely amicable. Plaintiff, after mature consideration of defendant’s offer and after consulting with his attorney, decided to accept it. The fair market value of the Beatty property at the time of the sale, September 20, 1949, was the price offered by defendant and accepted by plaintiff, $35,577 including severance.
WILLIAM R. HARDGROVE
24. Defendant’s negotiator, George, called on plaintiff William K. Hardgrove on October 31, 1949. He had looked forward to calling on Hardgrove because in 1939, 1947 and 1949 Hardgrove had purchased property in Canton Valley and presumably knew the local land values and George was *230 interested in what his reaction would be to the defendant’s appraised values in the valley. Plaintiffs Christie and Beatty were not in Canton Valley proper. Plaintiff also had the reputation of being an excellent farmer. This is the same Hardgrove referred to in finding 5 who took the initiative in setting up a meeting in April 1949 between defendant’s agents and the local landowners. Georgs offered plaintiff $16,498 for the 98.9 acres of his land desired by defendant. There is a conflict of evidence about Hardgrove’s immediate reaction to this offer and as to whether or not he solicited legal advice about it. The fact is established, however, that he accepted the offer the next day, November 1, 1949, in the office of his lawyer in Townsend. The contract provided that plaintiff could retain his improvements, appraised at $4,436, for the salvage value of $774 which was deducted from the appraised value of the property. Plaintiff thus received $15,724. The total time spent in negotiations with Mr. Hardgrove did not consume more than an hour or two.
25. The Hardgrove property acquired for the reservoir is described in the petition and consisted of 98.9 acres in two tracts. One tract consisted of 60 acres and was a complete operating unit appraised by defendant at $11,636. Plaintiff had bought this property in 1939 for $6,000. The other tract consisted of 38.9 acres which was part of a 320-acre tract of land. This latter tract had been bought by Hardgrove and a partner, Kane, in January 1947 from the Teague estate for the sum of $25,200, or $78.25 per acre which plaintiff considered a fair price at the time. The partnership was dissolved and plaintiff Hardgrove bought out Kane’s interest in March 1949 for $15,073.55, or $93.75 per acre, leaving Kane “whole,” some improvements having been made on the property in the meantime. There were no improvements on the 38.9 acres of this larger tract acquired by defendant for $4,862.50. Water rights out of the Montana ditch were retained by Hardgrove. Plaintiff was offered and accepted the total appraised value of $16,498.50 as noted above, or approximately $159 per acre after deducting the salvage value of improvements.
26. Defendant’s appraisal report, which is in evidence, is signed by three appraisers and their superiors and is dated *231 June 11,1948. It puts a valuation on the land of $12,062.50, all but four acres of it being valued at $125 per acre and the balance at $50 per acre. The land was irrigated and adaptable for beets, alfalfa, grain and livestock feeding. The four acres were adaptable for buildings and lots. Improvements which were on the 60-acre tract were valued at $3,940 and the water supply at $200 and fences at $296. The following comment was noted by the appraisers on their report:
The 60 acre farm is smaller than the average for the community but when used with his 319 acre tract and leased 160 acres (Kane) it furnishes a headquarters for hired help. (They had 36 Philippines working the beet fields in 1941.) The 60 acre tract is too small for an average family.
The appraisal report indicated the land was located about six miles from Townsend with bus service to the nearest school, had fair roads, rural mail delivery, telephone, electricity and was all irrigated at little or no charge for water. The 38.9 acres had shares in the Montana ditch and the 60-acre tract had rights in the Yankee ditch. The tracts of land were two miles apart but both in the central part of Canton Yalley. No severance was allowed as the purchase of the 38.9 acres did not affect the economic operation of the remainder. Defendant’s appraisers considered not only the purchase by Kane and plaintiff but the sale from Kane to Hardgrove and a sale from Zimmerman to Meyer of 494 acres between plaintiff’s two tracts for an average of $106.60 per acre in March 1947.
Also considered as a comparable sale was one from Wilbur Merritt to W. Glenn Kirscher on January 25, 1947, 88 acres for $8,000, or approximately $90 per acre. This information was from courthouse records. The purchase by Neild referred to in finding 10 was also considered. Waddell admitted that being an estate sale the property was probably appraised low to reduce inheritance taxes but said that it was a public and advertised sale. This witness also considered sales in the Gallatin Yalley in the Bozeman, Montana, area in an adjacent county 40 or 50 miles away from Canton Yal-ley. This too was a sugar beet growing area. These sales *232 were considered because the prospect of the dam stifled sales somewhat in the reservoir area but accelerated them around the fringe. The facts about sales in the Gallatin Valley are not established by competent evidence.
27. The evidence conflicts as to the circumstances under which defendant’s appraisal was made. Plaintiff testified that no appraiser ever asked him for any information about his property nor did his wife recall meeting any appraisers. Plaintiff did recall that two men stopped by one day when he was busy and his partner was present. Mr. Kane took these men over to see the house but plaintiff felt that Kane did not know enough about his operation to be able to advise appraisers. Plaintiff’s appraiser, Waddell, said, however, that while he talked to Mr. Hardgrove only briefly, since plaintiff was busy on the farm, he inspected and appraised his property and was on it a dozen times. He measured the buildings, inspected crops, and had arranged with Mr. Kane, owner of a place Hardgrove was operating as a tenant, to meet with him at the Hardgrove farm to make an appraisal. The properties were on opposite sides of the same road. He got figures on plaintiff’s beet production from the Missoula Sugar Beet Company. Waddell was accompanied by two colleagues who signed the appraisal report. Whether they talked to plaintiff is not established. Their field notes upon which their appraisal was based were destroyed after the sale was completed. Waddell admitted he did not have the operating costs on the Hardgrove place but used others in the neighborhood as “guinea pigs” or as a yardstick. He also used U. S. D. A. statistics. Mr. Waddell said his field notes included production figures and that he worked out a landlord’s share on a hypothetical crop production of a typical farm operation and capitalized the income as a check against his appraisal. The Kane and Johnson farms and one other neighboring place were used as typical farms to work out a crop rotation and production plan. This typical setup was then used as a yardstick in determining value for other places which were considered to be equal or comparable.
Appraiser Waddell did not know what plaintiff’s income was. He felt that such information would have been more relevant in case plaintiff was applying for a loan. The *233 evidence on plaintiff’s income makes it impossible to capitalize it as a check against the various appraisals because it includes not only income from the property bought by defendant but from rented property, Government payments for weed removal, and salary on an outside job. Plaintiff’s income tax returns for 1947-1949 show an average income of $7,904.58, which capitalized would make his land worth $348.52 per acre, except for the qualification above. Of course, income for 1948-1949 was not available to defendant’s appraisers in May 1948 when their appraisal was made.
28. Plaintiff Plardgrove’s disenchantment with the deal he had made with defendant set in when he said he learned that a neighbor just across the Irish ditch had been offered $192 per acre for ground of the same quality as his. This reference in the record is to the sale of the property of Jerome Merritt on November 4, 1949. He also said he found out that defendant had four or five different prices on the ranches and cited the case of Bert Plymale. These cases are discussed in more detail hereafter. Plaintiff was under the impression that McCormick had stated at the meeting that the owners would all receive the same price for the same type of ground. He indicated that defendant’s negotiator, George, had warned him that if he did not accept defendant’s offer, the ground could be condemned and it would be tried in Federal court, maybe in San Francisco, and that it would mean he could not lease it back and it would be a long time before he got anything that the lawyers did not take. Mr. George did not remember making any such representations but rather that he offered to help plaintiff get relocated and did send a real estate man to see him. Plaintiff insisted that it had been represented he could relocate for what defendant would pay him but that extensive search for comparable land revealed this to be untrue. He also accused defendant’s agent of misrepresentation about having purchased the Kane place at a time prior to negotiations for plaintiff’s property. The properties were appraised at about the same time. The effect of these determinations by plaintiff, whether true or not, was not sufficient to impel him to ask the court to set aside the friendly condemnation proceeding it was necessary to have to clear a cloud on his title in 1950 before the sale of *234 November 1, 1949, could be completed. Counsel was not consulted about the length of time an unfriendly condemnation procedure would take or what it would cost or what his rights would be in the interim.
29. Prior to trial of this case plaintiff Hardgrove had his property appraised by Bayard L. Taylor of Helena. Mr. Taylor was reared on a farm, has a degree in agriculture, operates a leased ranch of 12,000 acres, has appraised land for a bank since 1947, belongs to various appraisers’ associations and is familiar with Canton Valley. He became familiar with plaintiff’s property in 1947 checking it for his bank which was making loans to plaintiff. Pie was familiar with the type of soil although some of the land was flooded at the time of his appraisal for this case. He had made soil borings on the portion of plaintiff’s property originally bought from the Teague estate. The parties agree that the land here in question was all good ground with ample water rights, but plaintiff’s appraiser said that the Teague tract had some No. 2 land which made it of less value.
30. Mr. Taylor’s appraisal is much higher than defendant’s. He appraised the Teague lands, 320 acres, at $137,113.50. Pie said that this land was worth $431 per acre but when you take everything into consideration it is worth $469.47 per acre. This was the land which plaintiff and his partner Kane bought for $25,200, or $78.75 per acre, in 1947 and for which plaintiff paid Kane $15,000 for his undivided one-half interest, or at the rate of $93.75 per acre in 1949. For the 38.9 acres of this property purchased by defendant, Taylor gave it as his opinion that it was worth $18,262.38. The 60-acre tract, sometimes referred to in the record as the home place or the Canton place, was valued at $483.20 per acre or $28,992.10, for a total valuation on the 98.9 acres of $47,254.48, an average of $477.80. Plaintiff here claims $31,530.48, being the difference between his appraiser’s valuation and the $15,724 he received from defendant after deduction from defendant’s appraised value of $16,498 the sum of $774 for salvage value of his improvements.
31. Taylor’s appraisal was based on what he called the landlord’s share theory and on other sales. In developing the first approach, he took the production figures given to *235 him by plaintiff and from such, other sources as available to him. These figures, based on plaintiff’s testimony, included yields from other properties which he rented, his gross income which included pay as an operator of a movie projector, and Government payments for weed eradication on the Teague estate. The production figures included years both before and after the sale. Expenses the landlord would have to bear were deducted from the landlord’s share of production and its value and the net was capitalized at six percent which was the rate at which local banks were loaning money. Mortgage money was available from the Federal Land Bank at four percent and insurance companies at five. This appraiser said that if you take one-sixth of net income and multiply it by 100 that would “give the amount of money that it would take to invest to get a return at six percent interest on the amount of the net income or the landlord’s share.” In other words, when you capitalize at six percent you get a figure which you would have to have to invest at six percent in order to get the landlord’s share.
32. In considering other sales, Taylor rejected the sale from the Teague estate to Kane and Hardgrove because it possibly had an element of compulsion in it, which is not established by the evidence, and for the further reason that an estate sale would require “money on the barrelhead” and thus is not likely to bring as many bidders as if the sale could be on terms. The number of actual bidders at this sale is not established nor are its terms. He rejected the sale from Kane to Hardgrove on the grounds that Kane was anxious to sell. He had no adequate explanation, other than elimination of the weeds, for his increasing the valuation of this land from the less than $80 per acre Kane and Hardgrove paid for it in 1941 or the $93.15 Hardgrove paid for Kane’s interest in 1949, to his own valuation of in excess of $400 per acre. He knew of no sales of property for $400 or more per acre in the area. He did, however, develop a theory of valuation based on other sales in Broadwater County outside of the flooded area.
In so doing, he used what he described as a “round-about approach.” Taylor used ten selected sales[3] which took place *236 between 1938 and 1954. None of the properties got water from either the Montana or Yankee ditches. They were under the Broadwater-Missouri and Big Springs ditches. Plaintiff’s expert, Plibbard, testified that the water from these ditches is not as readily available to users as water from the Yankee and Irish ditches. The price per acre of these tracts was unknown to this appraiser but he testified to the sales prices, the number of acres where known and the ratio of increase between sales prices. He did not describe the nature of the soil or improvements or otherwise demonstrate in what way these farms were comparable to those of the plaintiff’s in this case. He had been on some of these properties at various times. He did not attempt to evaluate what increase, if any, was brought about by reason of the war in Korea after it started in June 1950. He attributed the increased price of land in these sales to “the influx of farmers from Idaho and Utah, flocking into the area and buying land.” These people were potato growers who allegedly bid against one another for the land. He identified half of the ten sales used as being made to these potato farmers. The witness prepared a chart which is in evidence as plaintiff’s exhibit 10. In brief, this chart demonstrates that on the ten farms south of Townsend, east of the Montana ditch and outside of the flooded area but in the same county, the average consideration in their sales in 1943 was $11,020, but in 1951 had gone up to $43,454 which is a gain of 3.62 percent, or a ratio of 3.62. Taylor’s thesis is that had the dam not ruined the availability of plaintiff’s property the plaintiff would have benefited from this increase because some potato farmer would have bought it. Taking the sale of the Teague land to Kane and Hardgrove in 1947, for example, at approximately $80 per acre, and multiplying it by 362 percent, the appraiser’s valuation thereof is achieved for its sale to defendant on November 1, 1949.
It is found that this theory, and the evidence on which it' is based, is not applicable to demonstrate comparable fair market value.
33. The settlement between plaintiff Hardgrove and defendant, whereby plaintiff retained his improvements and was paid $15,724, was fair and just when made, represented *237 the fair market value at the time, and was satisfactory to both parties. There is no evidence of any complaint by plaintiff to defendant or allegations of fraud by him prior to the making of this claim. Plaintiff was an exceptionally able and successful farmer and rancher and familiar with land values in Canton Valley at the time he sold to defendant.
HERBERT W. GILL
34. Defendant purchased from plaintiff Herbert W. Gill and his wife, Etheline, 160 acres for the sum of $24,771 on November 3, 1949, as a result of negotiations between plaintiff and Vernon George on the preceding day. The contract reserved to the plaintiff all improvements located on the land.
35. The negotiations were conducted in friendly fashion. Plaintiff had attended the McCormick meeting in April 1949 and as a result was of the impression that the price offered by defendant was the top appraised price, was replacement value, that the defendant was paying the same price for the same type of land, and that if he did not accept the offer made by defendant he could go to court about it. Plaintiff testified that defendant’s negotiator told him that defendant had already purchased the ranches of neighbors Hardgrove, Kane and Johnson. Defendant had, in fact, purchased the Hardgrove place but not the other two. No purchase prices for other properties were mentioned, however, so it is found that plaintiff could not have been influenced thereby in accepting the valuation put upon his own property by defendant, assuming his testimony to be correct although denied by George. Plaintiff also testified that George told him if plaintiff went to court that sometimes a man never lived to see such a case settled. This, too, is denied by George. Plaintiff had opportunity to consult an attorney after the offer was made and before it was accepted but did not do so. The evidence establishes that plaintiff’s principal concern at the time was as to whether he would retain the improvements and, if so, what use would be made of them.
36. Defendant’s appraisal report in evidence is dated June 11, 1948, and is signed by John Woodcock, Oscar *238 Erickson and by Bert Waddell, the latter appraiser testifying in this case. As is true with all other such reports, it was approved by defendant’s legal counsel, the regional director and by W. N. McCormick, regional land officer. Plaintiff did not recall going over his property with any Government appraiser but recalled that he was asked on one occasion by a man, who could have been such an appraiser, about the cost of a bunk house on his property. Waddell gave a fairly complete account of his conversation with plaintiff. Waddell was interested in this property because it had been recently purchased by plaintiff and was the highest recent sale of record in the area. The land and improvements were examined and the ample supply of cheap water out of the Yankee ditch verified. The production of alfalfa was discussed. The appraisal report states that beet production was good. It was a good, rather level family farm, as good as any in the valley and located in the center of the valley. The improvements were old and were being neglected on account of the pending reclamation project. The property was located five and one-half miles from Townsend on a fair road and with telephone, electricity, mail delivery and school bus. The land was irrigated except for about ten acres of pasture and improvements. Defendant appraised the 150 acres of the land which was irrigated at $125 per acre, and the ten acres which were not irrigated at $15 per acre, for a total of $18,900 for the whole 160 acres. In addition, defendant included in its appraisal a value of $150 for water supply and $224 for protective wire fencing, or a total up to this point of $19,274. Certain improvements, including dwelling house, barns, etc., were appraised at $7,705.
37. The total valuation as given on page 4 of defendant’s appraisal report is $25,979 and plaintiff was offered this amount. Plaintiff elected to retain his improvements for their salvage value of $1,208 so was actually paid $24,771 by defendant as noted in finding 34.
There is an error on the appraisal report. The building improvement valuation of $7,705 is listed in the summary on page 4 as $6,705. Neither party has noted the error. Had the error not been made, the total valuation *239 would have been $26,979 and this sum would have been offered to plaintiff. Using the correct figures and including all improvements in the total, defendant’s appraised price would have been $168.62 per acre for plaintiff’s property, or $161 per acre after salvage value of the retained improvements is deducted. Plaintiff testified that he got $154 per acre and he did get $154.82 based upon the erroneous total valuation less salvage value of improvements.
Inasmuch as plaintiff was allowed to retain the improvements for their salvage value and defendant’s error was not in the price put on the land, the error was to plaintiff’s benefit, but being unknown to him may have accounted in part for his belief that defendant’s valuation was too low. It cannot be determined from the record whether had he known of the error he would have made a different decision about retaining his improvements.
38. Defendant’s appraisers capitalized the farm but relied mostly on what a willing buyer would likely pay a willing seller. Plaintiff’s own purchase was considered as a comparable sale, as well as another farm half a mile east which was sold in March 1947, averaging $106.60 per acre. This latter sale was from Zimmerman to Meyer, referred to in findings 10 and 26. The irrigated land in the latter sale was valued at $110 per acre, dry cultivated land at $30 and partly irrigated land at $20 per acre.
39. Plaintiff bought his 160 acres in 1944 from Charles Burgess after renting it for 14 years. The sale price was $20,000, or $125 per acre, and plaintiff paid it off in four years. Plaintiff still owed some money when he had paid for his farm but had a profitable operation, netting annually just under $4,000.
Plaintiff’s expert, Hibbard, valued plaintiff’s property at $450 per acre without improvements. He had been on it prior to the flooding but not for the purpose of making an appraisal. He based his appraisal on his general knowledge of the area and data given him by plaintiff and others, soil maps and photographs. Hibbard applied Taylor’s theory, described in finding 32, and multiplied the 1944 purchase price of $125 per acre by 362 percent and concluded that the fair market value on the date of sale to *240 defendant, November 3, 1949, was $450 per acre. Taylor used the same formula for Gill. Taylor and Hibbard thus valued the property at $72,000. Plaintiff here claims $47,229, which represents the difference between plaintiff’s appraisal and defendant’s appraisal, as stated to plaintiff, less the salvage value of improvements retained, which is the sum received by plaintiff from defendant as noted in finding 34. Using this formula but correcting the error in computation made in defendant’s appraisal would result in a claim by plaintiff for $46,229.
Hibbard also arrived at approximately the same result as under his theory in the paragraph above by multiplying the 1944 sale price of $20,000 by 3.62, the formula used by,Taylor in the Hardgrove case. He also capitalized hypothetical earnings at five percent and arrived at a valuation of $85,-000. Hibbard gave no consideration or made no reference to the 1944 sale or to the Hardgrove purchase in March 1949 or to the sale of Zimmerman to Meyer in March 1947. He said there were no comparable sales known to him and no comparable land, unless it was the adjacent estate of plaintiff’s mother, Mary Gill. He gave no record of any sales which approximated his valuation of plaintiff’s property.
40. Plaintiff claimed in his testimony that he did not receive a fair price comparable to that received by certain neighbors. He identified these neighbors as Jerome Merritt, the Mary Gill estate and Frank Wieferich. Mr. Merritt’s claim is the next one to be considered. It can be noted here, however, that defendant’s appraisal of the Merritt property, made less than a month before its appraisal of plaintiff’s property, is in evidence. It shows that for comparable land the unit price of $125 was allowed, the same as in the Gill appraisal. Including the improvements, however, the price per acre would have been approximately $191.94 per acre for Merritt as against $168.62 for plaintiff’s property. Less the salvage value of these improvements, plaintiff actually received $154.82 per acre, as noted in finding 37, and Merritt received $181.08 per acre after deducting from the total appraised price the $805 salvage value of his improvements.
A comparison of defendant’s appraisal of plaintiff’s and the Merritt properties discloses no difference in the land *241 value per acre for comparable land. Wben the land value and the value of the improvements are combined, however, Merritt’s property carries a greater “per acre” value, for the reason that Merritt’s property is approximately half the size of plaintiff’s. In this situation, the appraised value of plaintiff’s improvements, in the amount of $7,705, is distributed over his 160 acres, whereas the appraised value of Merritt’s improvements, $5,235, is distributed over only 80.5 acres, the size of his farm. Furthermore, ten acres of plaintiff’s property was pastureland which was valued at only a fraction of the cropland. There was no pastureland on the Merritt property. These reasons, together with defendant’s inadvertent error of $1,000 in its appraisal of plaintiff’s improvements, account for the apparent difference in the two appraisals.
As to the Mary Gill estate and the Frank Wieferich prop-ties, they were acquired on appraisals made in 1953. Property values had greatly increased by this time, defendant says, due to the Korean War, and, plaintiff says, due to the influx into Broadwater County of Utah and Idaho potato growers. The average per acre paid the Gill estate was $311.30 and $318.75 to Wieferich. However, not only were the sales later, in point of time to Gill’s, but these two properties had improvements of over twice the value of Gill’s, and several thousand dollars were allowed to each as severance damage while Gill had and claims none. Aside from these differences, Mr. McCormick testified that he thought the Gill estate and Wieferich appraisals were excessive. On this state of the record, these sales to defendant cannot be used to establish that plaintiff Gill did not receive fair market value of his land in November 1949. Hibbard, plaintiff’s principal expert, did not rely on these three sales cited by plaintiff to show he was not treated fairly.
It is found that plaintiff has not attempted to replace his land since selling to defendant.
41. The sum of $25,711 received by plaintiff Gill represented the fair market value of his property, less the salvage value of improvements, on November 3, 1949, the date of sale. This valuation was in line with other valuations for *242 comparable land in the neighborhood made at or about the same time and represented by similar sales at or about the same time.
JEROME O. MERRITT
42. Plaintiff Jerome C. Merritt and his wife, Mary, sold their 80.5 acres to defendant for $14,601 on November 4, 1949, after considering defendant’s offer made to them the day before by Vernon George. The contract was signed at plaintiff’s farm and notarized by Ebersole. There is a conflict in the evidence about the circumstances of signing. George said it was at lawyer Hook’s office and that Mr. Hook notarized the contract. The weight of the evidence shows George to be in error. Plaintiff did not seek nor have legal advice in making the decision to sell. Plaintiff was influenced largely by fear of becoming involved in a condemnation lawsuit and by the fact that neighbors Hardgrove and Gill had sold. Plaintiff Merritt had also attended the McCormick meeting in April 1949 and was of the impression that defendant would pay replacement prices for the land and that the same price would be paid for the same type of land. The water rights were sold with the land but the improvements were retained for their salvage value of $850. Building improvements had been appraised by defendant at $5,235. The total appraised price was $15,451. The plaintiff received $181.08 per acre after deduction of the salvage value of improvements and would have received $191 per acre, based on the total valuation, had he not elected to retain the improvements.
43. Plaintiff’s property was appraised by Waddell, Erickson and Woodcock for defendant. Plaintiff did not recall their visit at the trial. Their appraisal report is in evidence and dated May 19, 1948. The 80.5 acres were appraised at $125 per acre, for a total of $10,062.50. Building improvements were valued at $5,235, the water supply at $50, and fences at $104, which added constitutes the total appraisal set forth above. The farm was near Townsend and 38 miles from Plelena and with the same services enjoyed by plaintiff Gill. The appraisers made the following comment in their report:
*243 This is a small farm, highly developed, located on a poor road to the county road a quarter mile to the north, which is a dirt road leading into the north-south graveled road north out of Townsend. * * *
The buildings were above average for the community but, except for the house, were without paint. They were adequate for a farm twice the size. The Irish ditch furnished adequate water at low cost. The land was No. 1 land in the best part of Canton Valley and all of it could be cultivated. The defendant’s appraisers examined the land, measured the buildings and made their determination in the same manner as on the Gill property. The evidence conflicts on whether the appraisers talked to plaintiff but the appraisal report quotes plaintiff and the weight of the testimony is that there was a conversation between them but exactly what was said in any detail is not established.
44. Plaintiff’s expert, Hibbard, did not see the property and was not on it because it was flooded before he was asked to appraise it. However, he was generally familiar with the area, saw photographs of the farm and soil maps, and talked to plaintiff and others who knew the property. He appraised it at $450 per acre for a total of $36,000. This witness took the plaintiff’s income, as supplied by plaintiff for a period of 11 years, 1943-1954, inclusive, which capitalized at five percent gave a value of $30,960. However, it was his opinion that this figure was low because plaintiff was not using the property to its full capacity. He said that the land should yield an owner’s share of $2,627 against costs of $740, leaving a net of $1,887 which capitalized at five percent amounts to $37,740. The lesser figure of $36,000, however, was adopted as fair market value. No consideration was given to the improvements because Hibbard was unable to see them and for the further reason that he felt all improvements in the valley were 40 years of age or older, fully depreciated and of a type of construction that would not last much longer. Plaintiff here claims the sum of $21,399 representing the difference between Hibbard’s appraisal at $36,-000 and the $14,601 plaintiff received from the defendant.
45. Plaintiff testified that he was surprised to find out a few days after he had made his contract to sell that he had *244 been offered more than his neighbors, Gill, Hardgrove, and Riley who had similar land. The No. 1 cropland of all of these plaintiffs was appraised at $125 per acre plus improvements, the same as Merritt’s. Gill, Hardgrove and Riley, however, also had some land of lesser value and the improvements differed in value. These facts affected the total overall price per acre after salvage value of improvements was deducted so that they could be retained by the owners. Likewise, the over-all price per acre was affected by the varying number of acres involved in each sale. In the cases of Gill and Riley, however, the total appraised prices for the two properties of equal acreage was shown on the appraisal reports to be within $329 of each other, notwithstanding each had some land not of No. 1 quality and improvements were of varying value. It is not a fact that these plaintiffs actually received less for their land, absent improvements and the size and type of land, than plaintiff Merritt.
Plaintiff also says that the Gill estate, the Manleys, William Sullivan, and the Schreiners got more for their land than he did and that he had been on their land and it was not as good as his. How much more these people allegedly received was not stated. None, except Sullivan, is a plaintiff here. These properties were all acquired several years later after property values had increased. The Schreiner lands were acquired in condemnation in the district court and the value thereof fixed by a jury in 1953.
46. The defendant’s appraisal and purchase of plaintiff Merritt’s property was in line with similar property appraised and purchased at or near the same time and represented fair market value as of November 4, 1949, the date of sale.
MRS. ROBERT (RUTH) BLAKELY
47. Plaintiff Mrs. Robert Blakely owned a one-third interest in 80.5 acres in Canton Valley which defendant purchased on November 4, 1949, the day following negotiations by Vernon George. Mrs. Blakely owned another one-third jointly with her husband, and her father, Chester Cowles, owned the remaining one-third. These parties joined in the transfer and Mrs. Blakely and her husband received two-thirds of the sale price and her father the other one-third. *245 They were paid the full appraised price of $15,471.50 for the tract with improvements and water rights. Buth Blakely is the only person owning an interest in this property mentioned in S. 175 and who was authorized by S. 115 to proceed in this case. She and her husband testified. Mr. Cowles did not testify.
48. At the time of negotiation and sale all three owners mentioned above were present. Mr. Ebersole was the notary at the sale. As with the other plaintiffs, the evidence conflicts as to what was said by defendant’s negotiator. Plaintiff testified that the vendors were, in effect, frightened into the sale by George’s threats of condemnation, advice about the cost thereof, the time it would take (10 to 20 years), and the experience that farmers in the Fort Peck area had. Defendant’s agent denies all of this. It is established that the Blakelys and Mr. Cowles wanted to think the matter over, did so, did not seek any legal advice, relied upon the representations, whatever they were, of defendant’s agent, did not know what their neighbors were getting for comparable property, sold out the next day, sought other property but were unable to find comparable property which could be bought with the proceeds of the sale, and were of the impression gained from Mr. Blakely’s attendance at the McCormick meeting that the same price would be paid for the same classification of lands in the valley, but later came to the conclusion that the latter did not happen and that some neighbors got more and some got less.
Based on the foregoing and on the experience of the Schreiners, whose land was condemned but who got more in court from a jury than the appraised price, even after the lawyers received their fee, and who got their money in much less time than plaintiff says she had been led to believe was possible, plaintiff feels she has been ill-treated by the United States and asks $20,528.50, being the difference between what was received and the appraisal of her expert, Mr. Hibbard.
49. The legal description of plaintiff’s property is stated in the petition and the defendant’s appraisal report on it is in evidence. The appraisal was made by the same three men who appraised Merritt’s property and it was on the *246 following day. The land was adjacent and comparable and in the same quantity and location and with the same advantages as Merritt’s. In fact, at one time it had all been one farm. Blakely’s farm, however, had two sets of improvements. The total valuation on these improvements was $5,409 as against $5,389 for Merritt’s. The valuation on the land itself was exactly the same as for Merritt’s. The total appraised prices for the two tracts were only $20 apart. Mr. Waddell said that he called at the farm and talked to Mrs. Blakely but neither she nor her husband recalled ever having seen him prior to the trial. He must have been there, however, for he measured the buildings and their dimensions are stated in his report. Waddell said he assumed he talked to Mrs. Blakely but did not ask her name. Defendant’s method of appraisal was the same as in the Merritt and Gill cases and was based largely on comparable sales and what a willing buyer would pay a willing seller.
50. Plaintiff’s expert, Hibbard, was asked to appraise plaintiff’s property after it was flooded. He did not see it, therefore, but learned all he could about its production from plaintiff and the neighbors. He appraised the property at $36,000, or $450 per acre as of February 18, 1950. This is in line with his other valuations of comparable land and as previously noted is based on the Taylor theory described in finding 32. Hibbard also used another method of valuation which he described as follows:
I also arrived at that by setting up a crop share operation, under a rotation, employing a five-year rotation, the first year being in oats, the second year being in oats with a new seeding of alfalfa, and the next three years in alfalfa; using the customary owner share procedure, of the owner taking % of the grain, % of the hay, and the tenant doing all the work and providing all the machinery, and selling the product; and on that basis determined that the total share income on this property would be $2,460.27; using the four-year average prices as furnished to me by the Bureau of Agricultural Economics for that area, at that time, and subtracting from that the owner’s cost of operation, the taxes, water, maintenance, and allowance for management at the current commercial management rate, and fertilizer, a total of $720.00 in costs, leaving a net of $1,740.00, which, capitalized at 5%, would yield a value *247 of $34,800.00, which checks very closely with the $450.00, per acre value, which is $36,000.00.
In using the above formula, Hibbard applied it to 70 acres, eliminating ten acres not used for production and allowed nothing for improvements. He did not consider that they had any value. He gave no weight to any other sales, saying none were comparable. The capitalization theory is found to be not based on actual income and in comparison to defendant’s valuation is found to be too speculative and involves too many variables to establish a fair market price. It results in an excessive valuation far beyond what a willing buyer would have paid a willing seller or did pay at or about the time of the sales in question.
51. Plaintiff was not able to replace her property with comparable property. The new property can be irrigated but the water cost is very high. The soil is not as good. This property purchased in 1952 is near Helena and consists of 100 acres which cost $15,300. It is not all No. 1 land as was that sold to defendant. Plaintiff’s husband no longer devotes his full time to farming but has gone to work for a railroad and has a higher cash income. Some farmers in the new neighborhood do succeed, raising beets and potatoes.
Plaintiff, her husband and father owned land elsewhere but severance damage was not allowed by defendant and none was claimed by plaintiff nor considered by her experts who testified. Plaintiff’s husband, however, felt it should have been taken into consideration.
Plaintiff testified that her neighbor, Jessie C. Riley, did not get as much as plaintiff from defendant. The appraisals in evidence show that comparable land in the two tracts was given the same valuation. The value of the improvements differed and the Riley tract was considerably larger. Plaintiff apparently did not take these facts into consideration. She did not say how much less neighbor Riley got. She made a similar reference to the Herb Gill property and the same facts here stated about the differences between the Blakely and Riley properties apply to explain the different dollar figures involved in comparing her sale to Gill’s. Reference was likewise made to the Gill estate and the Wie-ferich sale. Plaintiff said that these sales were “quite a bit *248 later,” which in part explains it as they were made by defendant in 1953.
52. Plaintiff received the fair market value of her property at the time of sale on November 4, 1949, and a price which was comparable to Merritt and others with comparable land. Any variation in price is accounted for by the difference in the amount of acreage, retention and value of improvements.
MARX O. JOHNSON ESTATE
53. Amaziah and Mary C. Johnson signed a contract on November 9, 1949, for the sale of 161.56 acres of land in Canton Valley to defendant for a consideration of $24,514, improvements being reserved by the Johnsons. This contract with the owners was negotiated on the day before by Vernon George, representing defendant. The Johnsons have since died and Bobert E. Johnson is executor of the estate. The heirs are Mrs. May Watterman of Ballantine, Montana, and Mrs. Edwin Neild, the latter also a plaintiff in this case.
Mrs. Neild, a niece of Mrs. Johnson, testified that Mr. Johnson did not enjoy good health and although reluctant to sell on the terms offered did so on the urging of his wife. He was a good businessman who had purchased and sold real estate in the area before, and therefore knew something about the Canton Valley land values. At the time of this particular sale, the Johnsons were operating the Harvey Hotel in Helena. There is no evidence that the Johnsons were in any way influenced against their will by Mr. George or that he made any representations to them that were not according to the facts. The Johnsons and George had been acquainted for some time prior to the sale. Ebersole was the notary. He recalled no talk about possible condemnation.
54. The land, identified in the petition, was appraised on May 4,1948, by Waddell, Erickson and Woodcock at $25,598. The property at various times had been rented to a tenant by the owners and at other times operated on a crop-share arrangement. Data about these leases and arrangements are not in evidence and it is not established that the information was sought by the defendant’s appraisers. Mr. Waddell, who testified, talked to the owners and obtained some information about the production. However, the property was *249 valued on the same basis as the neighboring places of Gill, Blakely, Merritt and Biley. Defendant’s appraisers were not especially interested in the production because they did not rely on the capitalization theory in making the appraisal.
55. Defendant’s appraisal report is in evidence. One hundred fifty-six acres were classified as irrigated cropland and valued at $125 per acre; 5.56 acres were devoted to improvements and valued at $50 each. Total valuation for the land was $19,778. Building improvements were valued at $5,480, wells at $100 and fences $240, for a total of $25,598. The tract was adjacent to the property of plaintiffs Sullivan and Herb Gill, and that of Frank Wieferich, Mary Gill and Henry Meyer, who are not plaintiffs, but who also sold to defendant. The land was about five miles north of Townsend, on a good road and with the same services enjoyed by the neighbors, such as mail delivery, telephone, and electricity. There was an ample supply of water at little or no cost out of the Yankee ditch. All of the land could be irrigated.
The appraisers considered two comparable sales other than defendant’s purchases in the valley. Both were sales in 1947, one from Zimmerman to Meyer and the other from the Teague estate to Kane and Hardgrove. Both have been referred to heretofore. The adjacent Meyer property averaged $106.60 per acre. The irrigated portion of it sold at $110 per acre. Plaintiff’s expert, Taylor, did not give weight to either sale as comparable. As to the Meyer purchase he said he did not know .the facts about it and thought part of the land was east of the ditch, which would affect the soil and water. This is reflected in the valuation of the property, however. The dry land was valued at only $30 per acre and the partly irrigated land at $20. Further data about this land is given in finding 10 (e). The less valuable part of it was sold in 1948 for $104.50 per acre.
56. Plaintiff’s expert, Taylor, did not see the Johnson property until employed to appraise it. In May 1956 the waters of the lake receded from part of the property and he went on it, accompanied by Mrs. Neild, to make photographs and take soil samples. He testified that it was No. 1 soil. De *250 fendant’s valuation of the soil is the same as for No. 1 soil of the neighbors.
The production records provided by the former tenant were characterized by Taylor as “not too good.” However, Taylor did not rely on them but valued the farm by the capitalization theory at six percent based on his own estimate as to the “highest and best possible use” that could be made of the land. He did not consider the improvements as of any value. Taylor’s valuation was $71,182.80 as of February 16, 1950, the date the deed was executed. There is no evidence that property values in the valley increased between November 1949 and February 1950. Plaintiff claims the sum of $46,668, representing the difference between the amount received from defendant and Taylor’s valuation.
Taylor said that the only comparable sale was the one to Gill in 1944. This sale is described in finding 89. Gill paid $125 per acre at that time and Taylor and Hibbard on the basis of their theory of valuation described in finding 32 figured that by the time Gill sold it to defendant in 1949 it had gone up in value 362 percent to $450 per acre. Application of this formula and price per acre to the land of the Johnson estate would approximate Taylor’s valuation of it. Such a valuation is found to be excessive, not based on comparable sales or on any theory related to the actual facts and circumstances surrounding the property or market value in November 1949. Plaintiff claims here $46,668.80, being the difference between Taylor’s appraisal and the amount received from defendant.
57. Defendant paid the full fair market value for the Johnson property as of November 9, 1949. The appraisal of defendant and the sale price was in line with comparable appraisals and sales in the community at or about the same time, considering the improvements, amount of acreage involved and other pertinent factors.
JESSIE O. RILEY
58. Plaintiff Jessie C. Riley was the owner of an undivided interest in 129.31 acres of land described in the petition and is the only owner thereof to appear as a party here. This land was sold to defendant on February 21, 1950? for the *251 sum of $19,652. Vendors who signed the deed, witnessed by Frank T. Hooks, a lawyer and notary at Townsend, were Jessie C. Filey, Peter H. Filey, John W. Filey and Etta G. Filey. Blanche E. Filey signed the deed in Seattle, Washington. Plaintiff testified that she represented John and Peter Filey and that Blanche was deceased and that Jessie and Peter were to inherit Blanche’s estate. Etta is not further identified by the evidence.
59. Defendant’s negotiator, V ernon George, called upon the Fileys on November 9, 1949, and told them that their property was needed for the project and a contract was agreed upon at that time. Defendant’s appraised valuation was $25,650 for 160 acres of land and improvements. Plaintiff testified that the sale price was $19,650 and George testified it was $24,652. It is found that this is not of consequence, however, for Miss Filey and the other owners decided they wanted to retain the upper acreage where the improvements were. The contract was renegotiated by the office of Mr. McCormick, defendant’s regional land officer, whereby the Filey’s retained 30.69 acres and the original price was reduced to $19,652, which was accepted. This sum included $3,488.25 as severance damage. Mr. George told the Fileys that if they did not sell their property it would have to be condemned and that there was a possibility the owners might receive less. He stated that some of the neighbors had sold. Plaintiff felt that under these circumstances the thing to do was to avoid a lawsuit and to go along as others were doing. There was no discussion of what prices were being paid by defendant to others in the community. The evidence does not show whether in the almost four months that elapsed between the two contracts and the almost nine months elapsing between the first contract and execution of the deed on July 20, 1950, plaintiff availed herself of information about other sales, legal advice, or a private appraisal.
60. Plaintiff’s property was appraised in May 1948, about the same time as the property of the plaintiffs whose claims have already been reported here. One hundred forty acres were No. 1 cropland and appraised at $125 per acre. Twenty acres were valued at $115 per acre. The total appraised value of the land itself was $20,800. The buildings were *252 appraised by defendant at $4,610, wells $80, and fences $160, for a total appraisal of $25,650 for the entire tract. This would be, on an acreage basis, approximately $154 per acre.
Plaintiff Biley’s land joined plaintiff Merritt’s on the south. It was supplied with ample water from the Irish ditch, at no cost, and from the Montana ditch at a cost of about $60 per year. Plaintiff Biley had the same advantages of location and farm services enjoyed by Merritt. The property had been in the Biley family since 1898 and plaintiff is the third generation to have lived on it. The land was appraised for defendant by Waddell, Erickson and Woodcock. There is no evidence that they sought any information from plaintiff. They did visit the property, see Miss Biley and measure the buildings. There were no leases held by plaintiff at the time of the sale. Defendant’s appraisers considered as comparable sales the one from Zimmerman to Meyer for $106.60 per acre in 1947 and the Teague estate to Kane and Hardgrove for $80 per acre in 1947. Also considered was the appraisal of plaintiff’s property in 1949 at $100 per acre by three citizens of the community, Herb Gill, William T. Cotter and a Mr. Sullivan. This appraisal was for estate purposes and defendant’s agents gave consideration to the fact that it was probably below true current market value because it was an estate appraisal. The capitalization theory was used to check the valuation. All of the field notes made in the valuation process were destroyed by defendant’s agents after the sale because they were believed to be of no further use. The fact that production and operating cost data were not obtained by the appraisers was regarded by them as not essential to capitalization, because in using this theory as a check they relied on a hypothetical, typical operation in the community, determined as heretofore noted by information gathered from neighbors and from records available elsewhere. Their conclusion was that if actual figures were used for a given farm they would give an unreliable appraisal because they would reflect the management of the property. Defendant’s method of valuation was the same as used on neighboring comparable property.
61. Plaintiff’s expert, Hibbard, did not see the property for it had been flooded prior to his appraisal. He valued the *253 property at $58,189.59 which is at the rate of $450 per acre, or the same as he fixed for other similar places. This valuation is found to be based upon the Taylor theory of appraisal described in finding 32.
Hibbard also arrived at a valuation by the capitalization method. He figured the gross share value at $4,397, less expenses of $1,220, leaving a net share income of $3,177, which capitalized at five percent would yield a valuation of $63,540. He had no books or records showing that such income was possible but accepted the plaintiff’s statement about production and costs and income as the basis for his computation. He did not consider improvements. His valuation is based on alleged earnings for all of the 160 acres and represented the owner and operator’s share.
Hibbard considered plaintiff Riley’s farm the same type as the Merritt and Blakely properties but superior to plaintiff Neild’s. He said that he knew of no comparable sale except that of Burgess to Gill in 1944, which was at the rate of $125 per acre.
Plaintiff’s claim is based on Hibbard’s valuation at $58,-189.59. Plaintiff claims the difference between this sum and that paid by defendant, or $38,537.59. This is not the sum claimed in the petition, but it was stipulated that plaintiff may be considered to have amended to conform to her proof.
62. Plaintiff complains that neighbors Merritt and Manley received more for comparable property. Manley is not a plaintiff. His property was purchased by defendant some years after plaintiff sold and after property values had changed. Plaintiff, too, benefited by this increase of property values in subsequent years, for in 1956 defendant purchased the 30 acres, reserved by plaintiff and the other owners from the original tract, valued in 1950 at about $5,000. The price paid for this 30 acres was $14,000, or approximately $465 per acre. It is not shown by the evidence whether this sale included, in addition to the land and improvements, any damages to crops by reason of seepage. It was because of seepage that defendant made the purchase.
As to the Merritt property, which has been fully discussed heretofore, it is noted that it was only 80.5 acres. The Merritt improvements were given a higher appraised value. *254 Plaintiff, for instance, did not have running water or a bath or a furnace as Merritt did. Plaintiff, however, reserved the improvements until 1956 whereas Merritt bought his for their salvage value in 1949. When the difference in the value of improvements and what happened to them is considered, as well as the time and the amount of acreage, and the further fact that all of Merritt’s land was No. 1 land, whereas Riley had 20 acres of lesser value, it is found that plaintiff Riley was not discriminated against in favor of neighbor Merritt. It should also be noted that plaintiff Riley’s testimony about the price per acre received by Merritt, as compared to her own, included Merritt’s more valuable improvements. As noted, plaintiff Riley sold without improvements. Further, the two cases differ in that Riley received severance damage from defendant, whereas Merritt did not and claimed none. It is is found that, aside from all of these differences which invalidate the comparison as given by Riley, the comparable part of the Riley cropland was valued exactly the same as Merritt’s at $125 per acre.
63. The fair market value of the Riley property as of the date of appraisal and the date of sale was $19,652 which has been paid to plaintiff. The plaintiff was not compelled to sell by reason of any misrepresentations by defendant’s agents.
RUTH MCMAHON BRENNER
64. Plaintiff Ruth Brenner, a resident of Walla Walla, Washington, owned 1,377.49 acres of land lying along the Missouri River and partly on an island in the river. It consisted of two distinct farms or ranches separated by the Whaley and Frank II. Cook ranches. There were two sets of buildings. Defendant’s negotiator, Vernon George, met Mrs. Brenner on December 16,1949, at which time he talked to her and to her tenants, Mr. and Mrs. W. F. Bristow. He offered plaintiff the appraised price of $37,059.35 for the land and improvements. Plaintiff testified that she was “dumbfounded” by this offer which she considered low. Mr. George went with her to see her lawyer, Mr. Hooks. On Hooks’ advice plaintiff signed the contract, dated December 16, 1949, which allowed her to keep the improvements, and *255 she was paid the sum of $34,568 for 1,354.69 acres.[4] Plaintiff was also motivated in signing by the fact that she relied upon the representations of Mr. George that if she did not sell, the property could and would be condemned, that this would involve a lawsuit she was desirous of avoiding, that the condemnation procedure was time-consuming, and that the same price would be paid for other similar land purchased by the defendant for the project. She knew that the project was a certainty and that disposal of her land would have to be made. As is true in the case of most of the plaintiffs, the testimony is irreconcilable as to whether Mr. George said that condemnation would take 20 or more years. Mr. George denies having said any such thing. It is found that since plaintiff discussed the proposed sale with her attorney that any such misrepresentation if made by Mr. George would have been shown to her as false by her lawyer if she was concerned about it and that this was not a material element in her decision to sell. Mr. Brenner, not an owner of the land, was opposed to the sale at the time for reasons not in evidence. Mr. Hooks advised plaintiff that her husband’s signature was not necessary to the sale and that she should sign without his concurrence. Mrs. Brenner had title to the land through two former husbands, deceased.
65. Defendant’s appraisal report is in evidence and signed by appraisers Waddell and Woodcock. It is dated August 6, 1948. Neither defendant nor plaintiff’s appraiser considered that the Ruth Brenner land was of a quality comparable to the central Canton Valley lands such as owned by Hard-grove, Gill, Merritt, Blakely, Johnson or Riley. This land was cut up by sloughs, drainage ditches and by the river, and the larger part of it was on islands in the river. Some of it was good bottom land but difficult to utilize because of the difficulty of getting heavy farm machinery onto it. The highest and best use of the land was as a cattle and native hay farm. Plaintiff said that it was not farmed but was used for raising of cattle and hay. At one time it was a horse ranch. The soil was shallow and mostly unfit for *256 cultivation but wild bay and grasses thrived in the wet bottoms:
The total appraised valuation by defendant was $27,762.85 for the land itself. The highest valuation was for 90 acres of irrigated cropland adaptable for alfalfa and native hay and deemed to be worth $50 per acre. There were 210 acres of subirrigated native hayland valued at $30 per acre. Pasture was valued at $15 per acre for 997.49 acres in the river bottom and $25 for 80 acres of irrigated pasture. The total acreage thus valued was 1,377.49.
This property was only two miles from Townsend and from a school, on a good road and with BEA and telephone. There was a gravity ditch from the Missouri River furnishing an ample water supply at no charge.
Defendant appraised the buildings at $8,725, wells $200 and fences at $372.
At the time of sale to defendant plaintiff was receiving $1,500 per year for the rental of her property, $750 for each ranch. The tenant occupied the south set of buildings. In the winter the north set of buildings was used part of the time as a winter camp when cattle were being fed. These buildings were hardly usable.
Plaintiff had no grazing permits at the time of sale. Plaintiff held two leases but the full facts about them, including cost thereof, are not established by the evidence.
66. Defendant’s agents used the comparative market value method of appraisal. They did not meet Mrs. Brenner but they did visit the property, measure the buildings and talk to the tenant who advised that 350 tons of hay were produced on 300 acres. One of the sales relied upon by defendant was that of Rogers to Mazola mentioned in findings 10 and 19. This sale was for an average of $25 per acre, including improvements, in March 1949. It, too, was a hay ranch with a good water supply. Without the improvements the sale price would have been a little over $22 per acre.
Also relied on by defendant was the sale of J. F. Ranch Company to Smith, mentioned in finding 19. This sale was in 1946 and the land involved therein was appraised similar to plaintiff Bremier’s and to the Rogers’ land. The average price per acre was $19.51, including improvements.
*257 Defendant relied, also, on a comparison of the hayland which Amaziah and Mary C. Johnson sold to H. C. Plymale in 1947 at $10.57 per acre. This was all pastureland with a high-water table. There were no improvements. The tract joined other lands owned by Plymale and made good pasture. Plymale told Waddell that he thought he got what the property was worth and as much as he would get from the Government.
One of defendant’s appraisers talked to the parties in the sale of the Teague estate to William and Edward Eagen of 120 acres, also near Townsend, for $15 per acre. This was di'y land, without irrigation or improvements.
Defendant paid plaintiff an average of $25.50 per acre for the 1,854.69 acres purchased, not including improvements.
67. Hibbard, plaintiff’s appraiser, did not see the property before it had been flooded. He based his appraisal on information given to him by plaintiff. He arrived at a valuation of $79,120, which is the figure in the petition, by what he called the acreage method. He determined that 550 acres were good for wild hay and worth $100 per acre and 804 acres of pasture were worth $30 per acre. This would average approximately $58 per acre. Hibbard did not consider improvements. He did not know of any other property sold in the area for the figures he used but said that $100 per acre was a “rule of thumb” at the time for hayland.
Hibbard also used the “animal unit” method of valuation. He took a five-year period, 1940-1944, when the land was actually being operated by plaintiff, and said that it carried 230 animal units valued at $350 each, giving a total valuation of $80,500. He used a $300 per animal unit on the Beatty property but explained this on the ground that the Beatty property was more difficult to manage. The difference was also attributed to a matter of judgment. The animal unit price also varies with the price of cattle.
A third method of valuation was employed by Hibbard. He estimated that the property could be rented for three times the $1,500 being received, or $4,500. Subtracting taxes and maintenance of $500 would give $4,000 net income which he capitalized at five percent to arrive at a valuation *258 of $80,000. There is no evidence that the property could have been rented for any such sum, or ever had been. Plaintiff said that before 1948 she had rented to two tenants and got $1,500 for the upper ranch alone. Why she rented both tracts to Bristow the following year for $1,500 is not explained. Capitalized at five per cent on the rent actually received, less the expenses deducted by Hibbard, the ranch would be worth $20,000 as against defendant’s appraisal of $37,059.35.
68. Plaintiff testified she went to the courthouse in 1952 and was astonished to learn that different prices had been paid by defendant for the same kind of lands. She illustrated this by reference to the properties of neighbors Frank H. Cook and John and William Whaley. She said that Cook got twice as much as she did, namely, $49 per acre, and that the Whaleys got $33.19 per acre for the same kind of land as hers, and that they did not have any improvements. She did not recall when these properties were sold but thought it was “quite awhile” after she sold.
The defendant’s appraisal on the Cook property is in evidence. It is dated August 10, 1951, which is three years after the Brenner appraisal. The date of the contract of sale is not in evidence. At this later date the Cook irrigated cropland adaptable for hay was appraised at $100 per acre as against $50 for what the appraisal report descriptions would seem to indicate was similar land held by plaintiff. Lowland grazing pasture was appraised the same as plaintiff’s but irrigated meadow was also appraised at approximately twice what similar land was three years before. The Cook appraisal on the land alone was actually about $38 per acre as against $25.50 per acre for plaintiff, assuming the land was similar. The larger figure given by plaintiff would include a $30,000 allowance for severance allowed Cook, only about half of his property being purchased by defendant. There is no evidence in the record about the Whaley land from which any comparisons can be made or facts found.
69. Plaintiff here claims $44,552, being the difference between the $34,568 received from defendant and the appraisal by Hibbard, her expert, of $79,120. The weight of the *259 evidence establishes that the Hibbard appraisal is excessive and that plaintiff received from defendant on the date of sale the full, fair market value for her property, the same being comparable to that paid for similar lands in the neighborhood purchased at or near the date of her sale. The sale was not influenced by any misrepresentations by defendant’s agents.
w. J. GAAB
70. Yernon George, defendant’s negotiator, on April 11, 1950, advised plaintiff W. J. Gaab of defendant’s offer, based on its appraisal of February 24,1950, by Thomas B. Yirden. Plaintiff and his wife, Edna, were offered $35,407 for 360 acres, including improvements, or $34,097 without improvements. Plaintiff desired time to consider the offer. On June 28,1950, Mr. George contacted him again and made an appointment to have the contract signed the next day. The contract of June 29 was for the property without the improvements. The negotiations were entirely amicable. It took only about 15 minutes to complete the transaction. The contract was notarized by the president of the State Bank at Townsend. Plaintiff accepted the necessity of sale as inevitable, and had been acquainted with the prospect of the reservoir for some time, having attended the McCormick meeting. Plaintiff was of the belief, as a result of conversations with Mr. McCormick, that one price would be paid by defendant for the same kind of ground in Canton Yalley. There was no dickering or “horsetrading” with Mr. George and no consideration by plaintiff as to whether or not he was entitled to a higher price. There was no discussion about water rights, severance, operating costs or production with Mr. George. Plaintiff was given the lump sum figures and advice that the alternative to acceptance was a lawsuit, which plaintiff was anxious to avoid.
71. The Gaab property purchased by defendant was operated as a cattle ranch and consisted of 360 acres of land, a legal description of which is given in the petition, as it is in the case of each plaintiff. It was appraised by Mr. Yirden who went over it with plaintiff. Gaab told Yirden how many head of livestock the place supported and that the crops were fed to the stock. The Yirden appraisal is in evidence. The *260 360 acres were valued at $19,149.50, or an average of $53.19 per acre, excluding improvements.
The appraisal of February 24, 1950, valued 94.2 acres as No. 1 cropland at a unit price of $125. There were 42.5 acres valued at $75 each, 131.3 acres of river bottom grazing land valued at $15 per acre and 88.7 acres of subirrigated pasture valued at $25 per acre. The farmsite covered 3.3 acres. Subirrigated land is that which has a high-water table that keeps the ground normally wet all of the time. Such ground has a natural growth of grasses and is too wet to cultivate. Irrigated pasture, on the other hand, is that which can be tilled and the grasses that grow on it are more palatable and better feed. Irrigated pasture may be worth as much as irrigated cropland if the soil is similar and if such pasture could be used for crops. Some irrigated pasture is suitable only for pasture because of the soil. Plaintiff had both types, as well as subirrigated land. Plaintiff had access to ample water from the Yankee ditch at nominal cost.
Plaintiff had lived on the property with his wife for about 40 years. There was a country store built prior to 1875, known as Canton, which they owned, and at one time there was a post office on their property. There was a house and certain other buildings, including a community meeting hall. Buildings were valued at $12,348.50 by defendant, wells at $250, fences at $744 and a nonfreezing water supply for livestock at $500. The property was about seven miles from Townsend and just to the north of the properties of all other plaintiffs heretofore discussed, except Christie and Beatty.
72. Plaintiff also owned 240 acres not included in the area desired by defendant. This land was four miles southeast of the property here in issue. This tract was under the Broadwater Canal. It was used in connection with the appraised property and defendant allowed severance damage of $2,415. The total acreage appraisal for plaintiff, including improvements on land purchased and severance, was $94.71 per acre. The 240-acre tract was purchased by plaintiff in 1944 for $8,500, or about $35 per acre. This land was not, however, as good as that bought from plaintiff by defendant. Aside from this tract no other property, leases or permits are involved. The 240-acre tract was used to *261 produce bay for winter feed, pasture on beet tops, grain and meadow stubble. The principal use of the properties was farming and livestock. Grain, beets and hay could be grown on all the better land and the rest was used for grazing.
73. Mr. Virden considered both farms as an operating unit and, based on what plaintiff had told him, considered that 278 animal units could be carried thereon. Yirden considered $200 per unit as proper for March 1950, including the entire property, both crop and pastureland. This gave him a total value of $54,607 for both ranches. His valuation of the 240-acre tract at $19,200 was deducted, leaving an appraisal for the acquired land of $35,407, including severance and improvements. The 360-acre tract was considered to be capable of sustaining 133 animal units at an animal investment of $266, which would be slightly higher, if considered separately instead of as an operating unit with the 240-acre tract. It would amount to $36,378. Virden did not consider capitalization nor go into the question of production, operating expenses or income. He did consider, and the appraisal report shows, two alleged comparable sales. Yirden did not testify about them and no findings are made with respect to them.
74. Hibbard, plaintiff’s appraiser, did not see the property for purposes of appraising it, as it was flooded, but he was generally familiar with the area and had been on the property in earlier years. He put a valuation on it of $68,000, not considering severance or improvements.
Mr. Hibbard considered that 80 acres were No. 1 irrigated cropland and valued it at $450 per acre as he did for the same kind of lands for other plaintiffs. This compares with the $125 per acre allowed by defendant for similar land. In addition, Hibbard allowed $200 per acre for the 40 wet acres and $100 per acre for the 240 remaining acres of pasture. He gave no comparable sales at any such figures, but, as did defendant in the case of this particular plaintiff, relied mainly on the animal unit theory of valuation. However, he applied such theory only to 280 acres, considering the remaining 80 acres as No. 1 cropland. He also used an animal unit price of $300, as he did on the Beatty claim, and considered the carrying capacity at 145.3 animals. To this *262 he added his valuation of the cropland. Hibbard also used the capitalization method of valuation at five percent on an estimated net operating income, which would give an even higher valuation than relied on by plaintiff.
75. Plaintiff complains to the court that he was penalized for his early and prompt cooperation with defendant because he learned later that neighbors a mile or mile and one-half away, who were not so quick to sell, got more money for similar land. Plaintiff cites as proof of this contention the sales of Frank Wieferich, the Gill estate and a Mr. Daniels, none of them plaintiffs here. He mentions, also, the Schreiner condemnation case.
Reference was made to the Wieferich and Gill estate transactions in finding 40 and elsewhere. They were appraised in March 1958 whereas plaintiff’s property was appraised in February 1950. Land values increased greatly in the interim. On the acreage basis it would appear from the appraisal reports that plaintiff received about one-third as much per acre as the other two. There are certain considerations, however, in addition to the lapse of time mentioned above which account in part for the differences in valuation. Plaintiff’s property was slightly larger and therefore his per acre price was smaller when spread over the larger acreage. In addition, the Gill estate and Wiefe-rich each received over twice as much as plaintiff for severance and had improvements of greater value. Aside from these facts, however, it is true that the land proper was given a higher appraisal at the later date. No. 1 irrigated cropland was appraised at $250 in 1953 as against $125 per acre in 1950 by the same appraiser for defendant. This points up another obstacle to any analogy between the properties. Plaintiff’s land as noted above consisted of several types: No. 1 irrigated cropland, No. 2 land, and irrigated and sub-irrigated pasture. Lesser valuations for this land of lesser quality lowers the per acre valuation placed on plaintiff’s property. On the other hand, the Gill estate had only No. 1 irrigated cropland, which, with its higher valuation, added to the other factors described above, accounts for a much higher per acre average valuation. Also, the Wieferich land consisted mostly of No. 1 irrigated cropland.
*263 Plaintiff’s wife testified that a Mr. Daniels got $10,000 more by holding out for condemnation. Daniels so testified.
76. The plaintiff claims here $33,903 which represents the difference between Hibbard’s appraisal of $68,000 and the $34,097 paid by defendant. On the record it cannot be said that plaintiff received less than the fair market value for his property at the time of its sale in 1950. The sale price offered and readily accepted by plaintiff was in line with property values in the area and accepted by plaintiff after mature consideration and without undue influence by defendant’s agents.
MRS. EDWIN D. NEILD
77. Mr. Edwin D. Neild, deceased, and his wife who is the plaintiff here, sold their 280 acres to defendant on February 7,1951, for the sum of $23,100, including improvements and water rights thereon. This is the 280 acres mentioned in finding 10 (c) which the Neilds had bought in 1948 for $10,000. It had been an advantageous purchase by plaintiff. The property had been listed for sale for $15,000 and appraised at $12,000. Plaintiff was the tenant. It was an advertised estate sale. Plaintiff was the high bidder. Plaintiff spent $2,000 on the place after buying it.
78. The contract with defendant was negotiated by Vernon George who first contacted the Neilds on November 10,1949. An offer of $16,500 was rejected. The property was reappraised by Mr. Virden and that appraisal is in evidence, dated February 17,1950. On February 6,1951, George left the contract at the office of attorney Frank Hooks in Townsend where plaintiff signed it. Plaintiff testified that George advised in January 1951 what the new price would be and that in the interim the decision was made to sell. Plaintiff said that the decision was against the better judgment of the owners, for they felt the land was worth more, but determined to be necessary because of the representations of Mr. George that if the offer was not accepted the property would be immediately condemned and they would lose possession. She gave evidence, also, that George promised to find another place of equal value for the amount of money offered by defendant and told them that it might take 30 years for the Neilds to get any money via condemnation and even then the *264 court costs and attorney fees would likely take it all. George denies having made these representations. Plaintiff had four children in school and needed money to buy another place. Neither she nor her husband had ever been involved in litigation and plaintiff said they feared it. They did not seek legal advice about their problem and accepted the alleged word of defendant’s negotiator because he was representing the United States and presumed to be honest. Mr. Neild had attended the McCormick meeting and, like the rest of his neighbors, was of the impression that one price would be paid by defendant for the same type of land.
79. It is noted that about a year elapsed between the date of the last appraisal and the time when plaintiff was notified of the new offer based on it, which was accepted. It was about this time that the Townsend Chamber of Commerce was making an effort to limit construction of the dam to a low one instead of a high dam as first proposed. If the low dam was constructed the Neild place might not have been flooded. There were congressional limitations on the spending of funds for the dam in appropriation acts for the fiscal years ending June 30, 1949, and June 30, 1950. Defendant attributes the increased valuation as reflected by the February 17, 1950, appraisal to the Korean incident which, however, started in the summer of 1950. This explanation could not be the fact in the Neild case. It is found that the increased valuation made by defendant, above the original offer, came about by reason of the strong determination of plaintiff to reject the original offer and the desire of defendant not to condemn the property if a sale could be negotiated. The evidence conflicts as to the attitude and language of Mr. George and Mrs. Neild during negotiations. It is found, however, that plaintiff was not and could not have been intimidated, misled and pressured into a sale by defendant’s negotiator, as charged, because alleged fear of condemnation did not prevent rejection of the original offer nor did it prevent plaintiff from “sitting tight” for over a year in order to get the higher offer which was accepted.
80. The evidence does not establish the valuation put on the various types of land by defendant’s appraisal which was rejected by plaintiff as too low in 1949. However, the *265 appraisal of February 17,1950, valued irrigated cropland of 34.3 acres at $125 per acre and No. 2 irrigated cropland of 69.8 acres at $75 per acre. Irrigated pasture of 74.5 acres was valued at $25 per acre, 41.2 acres of dry pasture at $15 per acre and other cropland at $50 per acre. This appraisal, made the same month as the one on the Gaab property, and by the same appraiser, Mr. Virden, places the same price per acre on the same type of land.
Improvements were valued by defendant as follows: buildings $5,758, wells $300, fences $465, livestock scales and sidewalk $160.50. The improvements were old, mostly of log construction, and with no evidence of upkeep for several years except improvements made on the house by installation of water, bath and kitchen conveniences.
Plaintiff also owned 960 acres of grazing land in the mountains used in connection with the farm. Mr. Virden considered it worth $4,800 after the Government got its contract. He allowed $1,500 as severance damage.
Plaintiff’s property was located five miles north of Townsend in the south central part of Canton Valley. Farm services such as enjoyed by the neighbors were available. Irrigation was essential to production of hay, small grain and pasture. A water right in the Yankee ditch was ample to supply necessary water at negligible cost. Plaintiff used the property to grow small grain and hay for livestock feed, utilizing hay and pasture for cattle and grain for hogs with income from sale of cattle and hogs.
81. Appraiser Virden was also aware that plaintiff held a forest permit but a check at the forest service office in Helena revealed that it was a temporary permit renewable annually. From 1948 through 1950 the permit was for eight head of cattle and previous to that it was for 800 head of sheep for ten days. Plaintiff still has the permit. Virden went over the fields with Mr. Neild and examined the property.
Defendant’s appraisers, Waddell, Woodcock and Erickson, also inspected the farm and according to the appraisal report talked to Mr. Neild sometime in the summer of 1948. Defendant gave weight to plaintiff’s own purchase of this property in 1948 as previously described. Also, defendant considered the sale in 1948 of Shannon to Bilquist, men *266 tioned in finding 10. There is insufficient evidence in the record to establish whether this latter was a comparable sale. Plaintiff Neild received more per acre than Shannon.
82. Plaintiff’s appraiser, Hibbard, saw this property before it was flooded but after the contract was signed with defendant. He made a map of the property, walked over it and took soil samples. He examined such records as were available and saw how the ranch was used. This inspection was on or about June 29, 1954. He determined the fair market value as of June 18,1951, but there is no evidence of any change in its value between that date and the date of sale on February 7, 1951. Hibbard’s valuation was $66,758. He accepted the $1,500 allowance made by defendant for severance. He allowed $7,150 for the improvements although he admitted that the roofs on some of the buildings were caving in and that they dated back to the time when logs were used in construction.
Hibbard considered that there were 145% acres of irrigated cropland worth $350 per acre, irrigated wild hay meadow worth $100 per acre, certain other dry farmable ground worth $60 per acre, and some land of lesser value including wasteland. He valued pasture at $45 per acre. By capitalized approaches, he achieved a lesser valuation of $63,186 based on reputed 1953 returns and $63,800 for a projection of an alfalfa-oat rotation. While Hibbard’s appraisal was long after the sale and is based on production and profits subsequent to the sale, he gave it as his opinion there was no reason to believe the production prior to the contract was less than in 1953. He did use plaintiff’s share of 1953 share-crop income as given to him by plaintiff at $3,359.30 in his valuation. Plaintiff did not have any books of record at the trial. Hibbard said those he saw were “not too complete.” Plaintiff testified at the trial that she had no figures pertaining to income from the ranch but was satisfied with it whatever it was. The property was described as singularly free of insects and crop losses due to hail.
83. Plaintiff was unable to find a suitable replacement for the land sold to defendant prior to the death of her husband. She had no help from defendant. She now has an 80-acre *267 farm northeast of Townsend. It has no spring or fall pasture. Seventy of the 80 acres are under cultivation. The water cost is high, $848 annually, served by the Broadwater-Missouri Canal. The water supply is also limited. The property cost her $16,500. There were no improvements except a small house. Natural stock shelter is inadequate. Plaintiff classes the land as No. 2 or No. 3 in quality.
84. Plaintiff complains to the court that her neighbor, Dan Sullivan, got more money than she did and that her range-land was not considered while Sullivan’s was and that his house was not as good as hers. Dan Sullivan is not a party to the case. His sale was in April 1952, while plaintiff’s sale was in 1951. The Sullivan sale to defendant was the subject of a letter from the Acting Commissioner of Reclamation on February 17, 1954, to Congressman Wesley A. D’Ewart. It is in evidence. A comparison of the amounts paid for the land, improvements and severance for these two properties follows, as taken from the letter:

The appraisal report on the Sullivan property is in evidence. His house was appraised by defendant at $3,672 and basement at $230. The Neild house was appraised at $3,-870. It had no basement. Neild sold the improvements. Sullivan elected to take the benefit of the valuation of his, less their salvage value of $935.
It is noted that Neild sold 280 acres and improvements while Sullivan sold 109.09. The difference in acreage accounts in part for the greater amount per acre received by Sullivan which is $69.54 as against $53.30. Sixty percent of the Neild tract was classified as irrigated crop and pastureland and 40 percent as pasture and dry cropland. On the Sullivan tract, 72.5 percent was classified as irrigated hay *268 and cropland and 27.5 percent as river bottom pasture and livestock shelter land. This difference in the amount and quality of the land would account in part for the difference per acre. The price per acre for the irrigated cropland was $125 for plaintiff and $130 for Sullivan.
Sullivan was paid $4,350 for severance as against $1,500 to plaintiff Neild. This came about because a portion of the Sullivan base property was acquired which included all the shelter and livestock water. Hibbard, plaintiff’s appraiser, accepted defendant’s determination of severance in this case. Defendant denies that any severance damage was allowed by the appraisers as a result of the grazing land remaining in the Sullivan tract, as charged by plaintiff.
Plaintiff likewise refers to the Gill estate and the Prank Wieferich sales made in 1953 and previously described. It is true that appraisals and sales by 1953 carried about twice the value per acre, on land proper, as sales in 1949, 1950 and 1951, and substantially greater than 1952. As noted in finding 75, however, it is almost impossible to draw any other comparison. The amount of and condition of improvements, the amount of acreage involved, the types of land, severance, etc., all result in per acreage figures of total valuation which are not analagous. This is strongly so in the Neild case where not only the acreage differed in amount but in quality. The Gill estate was composed entirely of No. 1 irrigated cropland and the Wieferich property was almost all of this quality. Both Hibbard and the defendant’s appraisers agreed plaintiff Neild’s land was not the best in the valley. Further, the severance factor was considerably greater in the latter two cases and the improvements of much greater value.
Plaintiff cites also the Schreiner condemnation case which has been discussed in connection with other claims. The Schreiner property, which had no improvements, was adjacent to plaintiff’s.
It should be noted here that Hibbard gave no consideration to the plaintiff’s purchase of the place three years before sale to defendant, because it was an estate sale. He cited no sales of comparable property at any figure approaching his valuation of plaintiff’s.
*269 85. Plaintiff here claims $43,658, the difference between Hibbard’s appraisal of $66,758 and the $23,100 received from defendant. Plaintiff received the fair market value of her property at the time of its sale, a value comparable to others appraised and sold at or about the same time. The sale was not the result of misrepresentations or undue pressure by defendant’s agents.
D. E. MAHONEY
86. Plaintiff D. E. Mahoney was the owner of an undivided one-half interest in property described in the petition and here in issue. The other half interest was owned by two sisters, Mary Ellen and Genevieve Mahoney, of Helena, Montana. These three people received their interests by inheritance. D. E. Mahoney is the only one of the three who is a plaintiff here and named in the resolution of reference pursuant to which the case is before the court. The property, consisting of 240 acres in Broadwater County, Montana, was purchased by defendant on March 2, 1951, for the sum of $30,000. Plaintiff had rejected an earlier offer made on November 18, 1949, for $22,000, saying the offer was inadequate and he would go to court before he would accept it. Certain improvements had been made on the property subsequent to the first appraisal. They had not been taken into consideration, therefore, on the first offer. When these were called to the attention of defendant, a reappraisal was made on February 20, 1951, and this is the one accepted by plaintiff. The contract was signed in the office of plaintiff’s attorney, a Mr. Small in Helena, who acted as notary. Mr. George was present at the signing and testified that Mr. Small advised the plaintiff and his sisters in detail about the transaction. This testimony was not contradicted.
87. Plaintiff had attended the McCormick meeting and, as a result, was of the impression that the same price would be paid for the same kind of land throughout the area where defendant would have to purchase it. Plaintiff testified that one of the reasons he decided to sell was that at the time he did so defendant had been following this policy and was paying $125 per acre for the top-grade land. Plaintiff had not been involved in any condemnation proceedings although he had been in court once on another matter. He testified *270 that he “knew all about condemnation.” He had a general knowledge of a condemnation case in connection with the early dam built in the area and mentioned in finding 3. He knew that the earlier case took a lot of time and said George related accounts of the trouble landowners had at Fort Peck. Some of the neighbors had sold their farms to defendant and this also helped plaintiff make up his mind to sell, plus a fear that he might not get more than the second offer or might get less if litigation ensued.
88. The first appraisal, before the improvements were made, was made by Mr. Waddell. The second appraisal was made by Mr. Virden and is in evidence, dated February 20, 1951. Plaintiff went over his property with Mr. Virden. Pie told Virden that some of his land was not as good as some of the other land in the valley because it had been neglected while operated by his ill brother. They discussed crops but not production records, operating costs or income. It was ascertained that there were no leases involved. Plaintiff, however, was not living on the property, but had leased it to a tenant. Plaintiff put no price on the land and Virden did not advise plaintiff what his appraisal of it was. The property was all cultivated. At various times it had been used as a cattle ranch. When the price of cattle was high it was to the advantage of the owners to so operate it.
89. The appraisal lists 147 acres of irrigated cropland at $120 per acre, 47 acres at $85, and 46 acres of irrigated pasture at $60 each, for a total, for the land proper, of $24,395. Buildings, part of them of log construction, were valued at $4,855, wells at $200 and fences $550. The farm was located adjacent to the W. J. Gaab, J. F. Meyer and W. F. Hardgrove properties. The average price paid to these neighbors, including improvements, was slightly higher than paid to plaintiff Mahoney. Plowever, plaintiff admitted that some of his land was wet although it grew crops. The Gaab appraisal was in 1950 and the Hardgrove appraisal in 1948. Plaintiff compared his property to Meyer’s. Plaintiff is claiming here a market price of $98,000 and Meyer is claiming $76,500 for the same amount of acreage. The latter had a hill on his property. Fur *271 ther reference to the Meyer transaction is in later findings where his claim is considered. The Meyer sale and approval was in May 1952. By 1952 prices were going up. Plaintiff objected to Wieferich and the Gill estate getting higher appraisals. As noted previously, sales in 1953 also brought more for comparable land.
Defendant gave consideration to the sale of the adjacent property on the north from McKane to J. F. Meyer in 1947 for $14,000, or an average price per acre of $58.33. This, too, was a 240-acre property with water out of the Yankee ditch. Consideration was given also to the sale in 1947 from Zimmerman to Henry A. and Irma D. Meyer of a property one and one-half miles to the south at an average price per acre of $106.60, a sale previously referred to in these findings.
Satisfactory farm services were available. Irrigation was essential but ample water was available from the Yankee and Montana ditches. The property had been in plaintiff’s family since 1884. Plaintiff was not able to replace it with comparable property.
90. Plaintiff’s expert, Hibbard, did not see the property before it was flooded but made an appraisal based on data supplied by plaintiff and on his own general information about the area. Hibbard’s appraisal put a valuation of $450 per acre on 200 acres and $200 per acre on the 40 remaining acres which he described as too wet to raise alfalfa but satisfactory for small grain. The total valuation was $98,000.
Hibbard also arrived at a valuation of $134,478.20 based on capitalization. This he abandoned, however, because it was shown to be based in part on income plaintiff earned on other property. Hibbard, also, established a crop rotation and worked out a landlord’s share which he capitalized at five percent to get a value of $118,680. This method, of course, is based on a hypothetical income which in turn is based not on the way the land was used but the way the appraiser thought it should be used. Neither of these methods of appraisal is found satisfactory to show fair market value at the time of the sale. Hibbard’s appraisal on an acreage basis is similar to his other appraisals and is found to be excessive, based upon the Taylor theory described earlier, *272 and in no way related to comparable sales or wbat willing buyers and willing sellers in the area were willing to consider or did consider as fair market value at that time.
91. Plaintiff here claims $68,000, the difference between alleged fair market value of $98,000 and the $30,000 received from defendant. The fair market value of plaintiff’s property at the time of the sale was $30,000 which plaintiff accepted after mature deliberation and advice and without the inducement of any false representations by agents of defendant.
CARROLL G. ITLSON
92. Plaintiff Carroll G. Filson, a retired mail carrier, sold his 160 acres of unimproved land, described in the petition, to defendant on June 29, 1951, for $7,500. The sale was negotiated by Vernon George who knew Mr. and Mrs. Filson and called upon them many times. Some of the visits were in connection with his efforts to help the brother of Mrs. Filson relocate. George first made an offer to the plaintiff on September 20,1949. Plaintiff testified that the offer was for $3,700 and was flatly rejected, plaintiff stating that he would let the land be condemned before accepting such an offer. Defendant’s evidence is that the offer was for $3,944. The visits with George, however, were amicable, the Filsons stating that they liked Mr. George. A reappraisal was made of the plaintiff’s property on June 12, 1951, by Mr. Virden and plaintiff was offered and accepted the full appraised price. There was a friendly condemnation action to clear the title.
93. Plaintiff did not attend the McCormick meeting. Defendant’s appraiser, Virden, called on him, however, and accompanied plaintiff to look at the land on June 7, 1951. They discussed one part of the property which was gravelly but had raised a crop of hay. There was no discussion of operating costs. Various items entering into the valuation were discussed. Plaintiff denies knowing that Virden was an appraiser, although Virden testified that plaintiff was so informed by him. The purpose and fact of the trip to the farm gives weight to defendant’s position. The appraisal report is in evidence. Defendant valued 100 acres of irrigated and subirrigated natural hay meadow at $60 per acre, *273 42 acres of river bottom pasture at $15 per acre and 18 acres of other pasture at $40 per acre. Fences were valued at $150.
The property was just south, of that of plaintiff Milton Beatty and lay along the western side of the Missouri Biver. It was strictly a hay and livestock property, however, the natural sod never having been disturbed. The land had been in the Filson family since 1887. In 1890 a large water right was reserved but never developed because of the constant threat since early days of a high dam in the valley. The native meadowland could be irrigated from the Missouri Biver ditch or the Blake ditch and some of the land was subirrigated. Ditches were in poor condition. Some 32 acres of wooded land were cut off from the rest by the Missouri Biver. This portion of the tract was not accessible to farm machinery and stock could reach it only with difficulty by crossing the ice in winter or by swimming the river. There is evidence that at places horses could not swim the river on account of the current.
Access to the entire property was difficult and over a dirt and gumbo road. Although the location was remote arid the tract was undeveloped, plaintiff had been successful in renting it for many years at $600 per year, gross. The tract produced from 100 to 200 tons of hay per year.
94. Yirden gave it as his expert opinion that no comparable sale was available to give plaintiff the benefit of the true value of his property. However, the appraisal report cites reliance upon the purchase by Neild from the Keenan estate in 1948, previously referred to, and a sale from Dallas to Cobban in 1951 at $31 per acre. The latter, however, was a diversified ranch, with improvements and cropland. There was no testimony about it in connection with plaintiff’s claim and the evidence is inadequate to establish it as a comparable sale. Virden’s appraisal is found to have been determined on an acreage basis as shown by his report and by the animal unit method under which he determined that the land would support 43 animal units at $175 each, which would equal a value of $7,525.
95. This is also one of the properties plaintiff’s expert, Hibbard, was unable to see but he gathered knowledge about *274 it from plaintiff, bis records, and general information about the area. He relied also on maps and photographs made by defendant. Hibbard’s appraisal was of the market value as of August 30, 1951, some two months after the sale, but no change in market value is asserted by either party for the interim. Hibbard verified Yirden’s findings with respect to the land cut off by the river but he understood it was hay-land rather than wooded. He verified, also, that the property was a wild hay and pastureland, never farmed, improved or fertilized. Hibbard testified that he knew of no comparable sales, that he regarded the fences as “fully depreciated out” and placed his valuation on the property at $16,000, or $100 per acre. Capitalizing plaintiff’s net average return from the property, $591, at five percent would give a value of $11,820 which Hibbard felt was low because the land had never been well handled, supervised or put to its full potential use. Hibbard added to plaintiff’s net income from the property certain other sums for the contribution of the land for grazing following the hay crop to increase the base for capitalization. By so doing, however, Hibbard reached a figure of $22,020 which is excessive, for plaintiff here relies on the valuation of $16,000 and claims $8,500, which is the difference between Hibbard’s appraisal and the sum paid by defendant.
96. Mr. George did not recall at the trial having discussed possible condemnation proceedings with the Filsons. He said, however, that they knew about condemnation and that he related to them some of his experiences and information in the matter. He also told plaintiff that the water right in this case did not, in his opinion, add value to the land because it was not used and had not been developed. There is no evidence that this was the view of defendant’s appraiser, and it is found that it was not, for Virden allowed plaintiff more money for the irrigated land.
Mrs. Filson testified, “I knew, of course, more or less about litigation and how long it takes for those things.” Mr. Filson had a brother-in-law whose land was condemned in previous years and he also had a knowledge of a general nature about the Stadler-Kaufman condemnation case in Canton Valley many years before. Plaintiff was of the *275 impression that if his land was condemned he would have to wait until the litigation was disposed of, possibly by the Supreme Court, before he could get any money. He did not say Mr. George told him this. He felt he could not afford to engage in such litigation and Mr. George made it clear that a condemnation suit was the only alternative to accepting the defendant’s second offer. After holding out and getting a reappraisal and increased offer plaintiff accepted it but now considers it was inadequate, relies on Hibbard’s valuation and testified that Mr. George, defendant’s negotiator, pressured him into signing by the spectre of what would happen if the land was condemned. The possibility of condemnation conjured up in plaintiff’s memory a picture of gophers drowning in irrigation ditches because they waited too long to get out before the water came up.
97. The appraisal of June 12, 1951, and the contract of June 29,1951, represented the fair market value of plaintiff’s property at that time. The offer was accepted by plaintiff after mature deliberation, rejection of an earlier offer believed by him to be inadequate, and was not as a result of any unfair or misleading representations by defendant’s agents.
H. C. PLYMALE
98. Plaintiff H. C. Plymale and wife, Myrtle, were owners of certain lands described in the petition, 807.28 acres of which were bought by defendant under a contract dated March 10, 1952, for a consideration of $43,100. H. C. Ply-male is deceased and his son, Paul, is executor of the estate and represented it at the trial. The owner reserved the improvements and water rights. The sale was negotiated for defendant by Vernon George. The offer accepted was based on an appraisal of February 26,1952, by Mr. Virden. There was an earlier appraisal, not in evidence, which resulted in an offer on September 19, 1951, of either $30,000 or $33,000, the evidence as to amount being uncertain. This offer was re j ected. After r ej ection of the first offer plaintiff employed Mr. Hibbard to make an appraisal for his guidance. This appraisal will be referred to more fully hereafter.
99. When Hibbard had completed his appraisal, which was for $61,688, the Plymales and Hibbard met with Mr. Virden *276 at Hibbard’s office to discuss the valuations. The next day Virden and the Plymales had a discussion at the farm. Plaintiff asked $65 per acre, or $52,473. This was not an asking price based on Hibbard’s valuation. Virden asked if Plymale would consider $45,000 but later reduced it to the contract figure, pleading error. The evidence conflicts about what else was said. Paul Plymale testified that Virden said it would be from five to fifteen years before plaintiff could get any money if the property had to be condemned but told a story about one lucky man in Wyoming who got his money in five years. Virden admits telling about the experience of his father who had to wait eight years for litigation to be completed concerning his own property in Wyoming. There are various other charges and countercharges about what was said. The net result was that plaintiff allegedly was influenced to sell out of fear of condemnation and because various neighbors were selling and, according to Virden, some had been condemned. Everything Virden allegedly said was believed by plaintiff because he was representing the United States Government. Some of the things Virden was alleged to have said were checked by plaintiff who determined that they were untrue but, nevertheless, it was deemed advisable to make the contract on the Government’s terms and it was signed in lawyer Frank Hook’s office.
Mr. George had an informal understanding with H. C. Plymale that H. C. would not sign a contract regardless of the price until his brother, John, had made up his mind to sell. George denies Paul Plymale’s testimony that he threatened condemnation and advised that the lawyers would get the money if the owner elected to follow such a course. George and Virden deny Paul Plymale’s testimony that they advised him subsequent to the sale that the property could not be replaced for twice what the defendant had agreed to pay for it. They deny, also, trying to induce the owner to sell by representing that he could thereafter occupy the property rent free until it was flooded. The owner leased the property but was flooded out sooner than he expected. No formal claim has been made for a refund, and it is not possible from the evidence to prorate the rent. The *277 contract states that improvements were to be removed by Marcli 1,1953.
100. Mr. Virden first visited the H. C. Plymale place in 1950 or 1951 and went over it with the owner. The H. C. Plymale property was located in the northeasterly end of the Canton Valley and about seven and one-half miles north of Townsend. It was not like the best part of Canton Valley. Farm services, however, were available and access was satisfactory. The property was disconnected but the four separate parcels were operated as one unit. The property was divided by that owned by Mr. and Mrs. John Plymale. Plaintiff leased some of the land of this neighbor and relative. The western portion of plaintiff’s land was cut up by Duck Creek and by sloughs and branches of the Missouri Eiver. Part of it was an island. Defendant determined the value of the property as limited to a livestock operation and the growing of hay. Eeference is made in the report to a Swiss legume, Astragalus Eubyii, which Mr. Plymale had planted and which increased the hay production. Improvements were described as old but well preserved. The house was without modern conveniences or electricity, which was available.
101. Defendant valued the 807.28 acres of land proper at $37,263. The sum of $125 per acre was allowed for 40.57 acres of irrigated cropland and $100 per acre for 135 acres of subirrigated native hayland. An allowance of $45 per acre was allowed for a fraction of irrigated pasture, $30 per acre for 608.41 acres of bottom pasture and $15 per acre for 20.30 acres of winter grazing land. The average allowed per acre was $46.16 and with improvements valued at $3,978, plus severance, $53.38 per acre. The appraisal report states:
This appraisal includes all of the land owned and operated by the Vendor’s except 91.63 acres and an old set of improvements remaining from a 160 acre unit operated by the son, and 320 acres located 8 miles east with no improvements. The property has been supporting two families. The income is dependable and the location is desirable. There is an assured lease in connection for 350 acres of bottom land with 70 acres of hay which will also be taken. The fee land and the lease will support 216 animal units per year with safety. *278 The gross income per year from the sale of livestock is about $10,000.00. This appraisal also includes the home which is a part of the main set of ranch building occupied by the Vendor’s. The remaining is not an economical unit, but will leave a home for one family, thereby eliminating the cost of two homes in rehabilitation. Seduction and liquidation of the working capital represented in livestock on this operation will displace 80%. The remaining will be unprofitable.
This appraisal covers surface rights only.
The fair market value of the whole unit of 1,218.91 acres was determined to be $51,225, or an average of $12 per acre. The fair value of the remaining unit was found to be $7,725 for 411.63 acres, at $18.75 per acre. Severance was allowed for 91.63 acres at $15 each for a total of $1,375. Fair market value, taking and severance, was computed at $43,500. The $400 difference between this amount and that paid to plaintiff represents the salvage value of the improvements retained.
102. Defendant gave consideration to the purchase by H. C. Plymale from Amaziah and Mary C. Johnson of 282.69 acres at an average price per acre of $10.57. This was pastureland. Paul Plymale did not know the details of this sale. Considered, also, was the sale of Frances Shannon to Otto Bilquist of 240 acres in 1948 at $50 per acre. This land was described as six miles south of H. C. Plymale’s property but comparable in operation, productivity and improvements. The location was more desirable, being one mile from Townsend.
Mr. Virden in his testimony made reference to the DelToog ranch which borders the John G. Plymale ranch and is near the H. C. Plymale property. This was described as a comparable livestock operation with good rangeland, improvements and irrigation. This ranch was purchased from Howard Doggett in 1947 and is mentioned in finding 10. It was sold by DeHoog to Schultz in 1949. Defendant considered, also, the sale of Little to Wing in 1952, likewise referred to in finding 10.
103. Defendant’s appraiser applied the animal unit theory of valuation to the H. C. Plymale property also. He considered that the carrying capacity of the entire tract was 216 *279 units at a market value of $238 each. Of this, $150 for 51 units would be allocated to the remaining tract and that portion taken was estimated to be capable of supporting 165 units at $264 each, which would approximate the defendant’s valuation as shown on its appraisal report. The sale of Bogers to Mazóla, reported in finding 10, and elsewhere, was for $222 per animal unit in 1952 and the sale of Little to Wing was figured at $200 per animal unit in 1952. The sale of Dallas to Cobban was for $250 per animal unit in 1951. DeHoog’s sale to Schultz in 1949 was equal to $209 per animal unit. Yirden estimated that tract would support 500 units, basing this conclusion on conversations with the owners, but Hibbard and plaintiff John Plymale said it would support only 300.
104. Mr. Hibbard estimated that plaintiff’s property would support 215 animal units on a year-long basis and fixed the price per unit at $300. This figure is supported by Mr. Wing. This would equal a valuation of $64,500. No sales were cited at this figure. The sale of Little to Wing in 1952 was at $200 per unit as noted in the finding above. Hibbard was on the property for the purpose of appraising it in June 1951. He examined it, studied available records and talked to the owner and his son, Paul, before arriving at his valuation of $61,688. He capitalized reported income and reached a valuation of $57,498. But, the $61,688 valuation here relied on by plaintiff was not arrived at by either the animal unit theory or capitalization. Hibbard put a price per acre on the land as follows:
45. 7 acres tillable hayland @ $100_$4,570
19. 0 acres cropland @ $200_ 3, 800
197. 0 acres hayland (NWÍ4 or Sec. 19) @ $100_19,700
135. 0 acres hayland (southern part of Sec. 19-20 and little of Sec. 14) @ $100- 13, 500
335.3 acres subirrigated grazing land @ $60_20,118
75. 0 acres waste 00
807.0 acres — Total value_61, 688
Hibbard allowed nothing for severance. He gave no consideration to any comparable sale.
105. Paul Plymale agreed that the best use for the property was to raise hay and cattle and that it had been so used. It *280 was subirrigated in part but not irrigated. In the spring the river would flood most of the hayland. He stated that the property had not been used to its best advantage for some time because of his illness, the age of his father, and the fact that Bangs disease hit the cows. This latter fact affects the number of cows run on the place. The herd was being built back slowly and had not been fully rebuilt by 1952 when the property was carrying only about 100. Paul Plymale was in error in concluding that defendant did not consider the value of the Swiss legume and did not allow any severance. Paul Plymale recounted the fact that in 1951 Mr. George promised to help find another place but testified that the real estate agent who called upon them had nothing comparable to offer. He testified, also, that he later learned of what happened in the Daniels, Hahn and Schreiner condemnation cases and that these cases showed the owners would get more if they went to court, that the lawyers would not appropriate the proceeds, that it would not take from five to fifteen years to get the money, and that his father had sold out too cheaply and was misled by defendant’s agents’ threats of condemnation and warnings that such would mean the owner would have to get right off the land. He testified, further, that a neighbor, John A. Graveley, “right across the fence,” received the $65 per acre which his father had offered to take but which defendant refused. Mr. Graveley’s sale was in September 1951 and he got $46.41 per acre for his land proper as against $46.16 for plaintiff. Including improvements Graveley got $5 per acre more than H. C. Plymale.
106. Plaintiff, now relying on Hibbard’s estimate of fair market value on the date of sale, March 10,1952, as $61,688, asks here the sum of $18,588, which is the difference between Hibbard’s estimate and the $43,100 received from defendant. H. O. Plymale was the first of the 14 plaintiffs, whose claims have so far been considered, to have his own appraiser prior to sale. He rejected the first offer made by defendant and secured a reappraisal considerably larger about a year later. In the meantime his neighbors were selling and the property of some was being condemned. He elected to sell at a price comparable to the valuation placed on similar types of land *281 by defendant at or about the same time. He is, unfortunately, deceased, but the weight of evidence shows that the sale, however reluctantly made, as were others in Canton Valley, was made after mature consideration of the known factors by a competent farmer dealing with agents of the United States, who, if they told him that his land would be condemned if he did not sell, were telling him the truth. The evidence establishes that one of these agents gave the owner information which was calculated to make him believe that a condemnation proceeding would be costly and prolonged. If, as represented by plaintiff’s son, this or other agents said that such a procedure would result in less money for plaintiff, it is found they were expressing their personal opinions of what a lawyer might charge or a jury might do and any reasonably intelligent person would know that the actions of a jury on facts which had not been presented to it could not be forecast with any reasonable degree of accuracy. Plaintiff was not prevented over a period of more than a year, while this matter was being considered by him, from consulting competent counsel or from asking his appraiser about the proper choice. Fear of condemnation did not present prompt rejection of defendant’s first offer. If plaintiff thought his appraiser’s valuation was correct, he could have presented it to the court in a condemnation case but elected to take less money to avoid doing so. His asking price was about $9,000 less than his appraiser’s valuation. That valuation is here found to be excessive and not to represent fair market value at the time of sale.
JOHN G. PLYMALE
107. Plaintiff John G. Plymale and wife, Olive, on March 11, 1952, sold to defendant 1,684.15 acres for the sum of $142,000, reserving the improvements. This sale was based on an appraisal of February 28, 1952, by defendant’s agent Virden. On September 30, 1950, plaintiff had rejected an offer of $88,000 from defendant, based on an earlier appraisal not in evidence. The first offer was made to plaintiff on September 18,1950, by Vernon George who also submitted the offer which was accepted. Subsequent to the. first offer and before the contract of March 11,1952, plaintiff had *282 his land appraised by Mr. Hibbard who valued the portion purchased by defendant at $275,189.60.
108. The plaintiff testified that he did not see or talk to any appraisers and that no one ever appraised his place, but he did see some men taking pictures of his buildings. The fact is that defendant’s agent, Waddell, was on the property in 1948 and plaintiff went over the entire place for three days in April 1950 with defendant’s appraiser, Virden, and gave him his production figures. Plaintiff remembered this event but not why Virden wanted to see the property. Virden’s appraisal report is in evidence. This report places a value of $130 per acre on 319 acres of irrigated cropland, $100 per acre on 497 acres of subirrigated native hayland, $25 per acre on 271.15 acres of winter pasture, and $35 per acre on 597 acres of river bottom pasture. The total valuation on the land proper was $118,844. The report contains detailed information about the improvements, their dimensions, construction, age and valuation. Detailed information is also in evidence concerning all of plaintiff’s land, as well as that which he held under lease. Buildings were valued at $3,357, wells at $200 and fences at $1,424. Plaintiff was allowed to retain the improvements for their salvage value of $500. It is noted that the values per acre for land proper were determined by defendant to be higher than for comparable land purchased by defendant in prior years and slightly higher than paid to H. C. Plymale who sold to defendant at the same time as John Plymale.
109. Plaintiff had been accumulating land over a period of many years. In all he owned 22,983 acres. Because not all of the land was purchased by defendant the sum of $18,675 was allowed for severance. Defendant considered the whole ownership as a balanced unit computed to support 1,230 animal units and the remaining ownership as an unbalanced unit computed to support 792 units, which is a reduction of 35.7 percent of the normal capacity. The value of the whole ownership was considered to be $345,500, which, multiplied by the 35.7 percent, is the sum of $123,350, the fair market value of the taking without severance. Defendant used animal unit values comparable to those on the sales of Doggett to DeHoog, Rogers to *283 Mazóla, and Dallas to Cobban. Defendant also gave consideration to tbe decline in net income before and after tbe purchase. Tbe appraisal report contains tbe following additional comment:
Tbis ranch is operated,at its highest and best use. At present it is stocked with 700 cattle and 2,000 bead of ewes before calving and lambing. It is operated by the owner and four grown sons, all of whom devote all of their time to tbe operation. Two of the sons are married, each with a separate home making three homes on the property, none of which are in the Taking. There are two sets of improvements on the Taking Area which are occupied by labor tenants when necessary. These improvements are old. * * *
The defendant’s appraisal report noted that the buildings involved in the taking had little or no salvage value, that the houses were not livable and the barns and sheds were used for temporary livestock shelter. The plaintiff’s property was adjacent to that of his brother, the plaintiff H. C. Plymale, at the northern end of Canton Valley. It had water rights out of the Yankee ditch.
110. Defendant’s appraiser gave consideration to four sales in 1947. The first of these was the so-called Duck Creek ranch purchased by plaintiff and a part of the unit remaining after defendant’s purchase. This land consisted of irrigated, cultivated, and pastureland two miles from the land bought from plaintiff by defendant. Plaintiff bought this land, 560 acres, from the Antoinette Teague estate, at an average price per acre of $40. The land had ample cheap water.
The second sale considered was from McKane to Joseph F. Meyer in 1947, involving 240 acres at an average price of $58.33. This land, heretofore referred to, adjoined plaintiff’s land on the south and had water from the Yankee ditch.
Defendant considered the sale of Zimmerman to Meyer, also previously reported, at $106.60 per acre but noted that the property included an elaborate set of improvements in excess of $10,000, representing $20 an acre in the sale figure.
Considered, also, was the sale from the Teague estate to *284 Kane and Hardgrove, at $80 per acre. This case has previously been discussed.
The average price paid to plaintiff for land proper was $70.56 but including severance and improvements it was $84.61. Plaintiff received the full amount of defendant’s revised appraisal.
111. When Mr. Hibbard appraised plaintiff’s land in 1951 he went over it carefully, took soil samples and examined plaintiff’s records, which he described as complete. He considered the property to be a combination grain and livestock operation with emphasis on .the latter although the land bought by defendant was described as the bulk of plaintiff’s irrigated cropland and as constituting 58 percent of the grazing and shelter area and animal unit months of grazing.
This witness considered the animal unit theory of appraisal but the record does not show the number of units he considered that the property would support nor the unit price used.
Hibbard took plaintiff’s net income, capitalized it at five percent and arrived at his valuation of $275,139. Defendant considered five percent as erroneous and would use ten percent which would cut Hibbard’s valuation in half by this theory. Hibbard said he relied on plaintiff’s tax returns for eleven years prior to defendant’s purchase of his land. They are not in evidence and it is not known what his income was per year during this period although Hibbard characterized it as stable and more than half of it from livestock. The livestock market was described as steadily rising for several years except for a dip in 1952 and 1953.
Hibbard said there were no comparable sales and no comparable land. He denied any comparison was possible between plaintiff’s property and the adjacent DeHoog ranch which, although it had superior buildings, was described by him as without adequate natural shelter, rocky, open to the winds and sunshine and with inadequate water rights. Plaintiff’s land had a growth of willows, cottonwood trees and brush along the river which gave it added value for stock shelter. Plaintiff himself worked on the DeHoog ranch in 1902-1904 and substantiated Hibbard’s estimate of it.
*285 Hibbard considered tbe leases held by plaintiff in his valuation but did not place any separate value on them. Plaintiff had 2,720 acres of State lease. He placed no value on plaintiff’s improvements, considering them fully depreciated.
112. Plaintiff attended the McCormick meeting and said that after he sold to defendant he was surprised to find that the defendant was not paying the same prices for the same type of land. He illustrated this by referring to the sales of Gill, Hardgrove, Merritt and Blakely, which were some years earlier. These plaintiffs got $125 per acre for irrigated cropland while plaintiff received $130. Plaintiff had previously been involved in a lawsuit over water rights. He was willing to sell for $150,000 to defendant although he thought his property worth more. However, he did not wish to get into a lawsuit, being 75 years of age at the time. He was confused about what Hibbard’s appraisal was, thinking it was $30,000 in excess of what he received from defendant, but stated that he was relying on the appraisal as the fair market value of his property. Accordingly, plaintiff here claims the difference between that appraisal and the amount paid to him by defendant. The claim is for $133,139.60.
113. After Hibbard had made an appraisal at plaintiff’s request, Virden, plaintiff and H. C. Plymale met with Hib-bard at the latter’s office on June 6, 1951, to discuss the valuation problem. Plaintiff knew that if he did not sell it his property would be condemned but he did not represent that any agent of defendant made any threats or comments to him about how long it might take. He testified that his land was condemned after he rejected the $88,000 offer in 1950 but the facts about this are not developed by the record. Plaintiff had considered this alternative and assumed the risk of condemnation by rejecting defendant’s first offer. Later, with a much higher offer, he decided not to run the risk of having his property valued by a lawsuit. Defendant mads him a lump sum offer and he did not know how it was broken down. He had given both Hibbard and Virden data about his income and his property. He wanted to get $8,000 more than defendant offered but elected to abandon both his asking price and his appraiser’s figures. *286 He knew that he was getting more for comparable land than neighbors who had sold out in previous years. The contract with defendant on March 11, 1952, and the appraisal of February 28, 1952, represented the fair market value of plaintiff’s property. The sale was negotiated after mature consideration by plaintiff, acting upon expert and professional advice and information, and without any misrepresentations by agents of defendant.
W. G. KIRSCHER
114. Plaintiff W. G. Kirscher and wife, Edna, on April 25, 1952, sold to defendant 530.74 acres of land, including water rights, in Broadwater County, Montana, for the sum of $52,500, the owner retaining the improvements. The offer accepted was based on an appraisal of March 27, 1952, by defendant’s appraiser, Thomas B. Virden. There was an earlier appraisal for defendant by Mr. Waddell sometime in 1948 but no offer based thereon was submitted to plaintiff, as plaintiff advised defendant’s negotiator, Vernon George, on November 18,1949, that he was not ready to sell. Plaintiff had known Mr. McCormick for many years and desired to negotiate the proposed sale with him. However, McCormick sent George with the proposed contract on April 5, 1952. Plaintiff and family were ready to leave for a visit in Washington State and did not execute the contract at that time, preferring to take it along for study. George advised plaintiff that it would be necessary to have the contract back by April 15, but when it had not been returned by that date McCormick called plaintiff in Washington State and advised that on account of the progress of construction it would be necessary to have a contract or institute condemnation proceedings right away, a step he wished to avoid. Both plaintiff and McCormick were exercised about the situation. McCormick, however, agreed to wait until plaintiff returned to Montana without taking action. Upon plaintiff’s return McCormick called upon him with Virden and the contract was then signed as noted above. Plaintiff was permitted to stay on the property without paying rent until December 31, 1953.
*287 115. In the process of appraising plaintiff’s property Vir-den called upon plaintiff on February 14, 1950, and accompanied by plaintiff went over the land and discussed with him its classification. This performance was repeated on February 25,1952. On March 6,1952, in a third discussion with plaintiff, Virden was advised by plaintiff that he disagreed with Virden’s classification of the land. On April 24,1952, the day before the contract was signed, Virden drove over the property with plaintiff and discussed the clearing of trees. Mrs. Kirscher, who testified that neither she nor her husband had seen any appraiser prior to the spring of 1952, said that on their return from Washington they learned for the first time defendant’s figures on the property. She testified, also, that Virden had advised them that if the property had to be condemned it would take seven years or longer and they would have to hire lawyers. Plaintiff had not previously been engaged in litigation. Virden denies mentioning condemnation to plaintiff and McCormick did not consider that he had made any threat of such action. The fact is, however, that plaintiff knew that the dam was going to be built and that he would have to dispose of his property via sale or condemnation. Plaintiff had lived on this property 45 years and was not anxious to sell. • Plaintiff was a well educated man, a civil engineer and graduate of Montana University, a former county surveyor, member of the State Water Conservation Board, and member of the Montana Legislature from Broadwater County. He did not seek any legal advice about his transaction with defendant, although the contract was signed in lawyer Hook’s office. Plaintiff sought no independent appraisal of his property prior to its sale.
Plaintiff’s evidence was that he was convinced he could get no more money than offered by defendant and in view of the possibility of condemnation and the time it might take, as represented by defendant’s agents, and in view of the fact plaintiff and wife were elderly they felt unable to get out and look for a new residence. The fact is, however, that plaintiff and wife did travel through Washington and Oregon for ten days looking for comparable property without success. Any property approaching plaintiff’s in value *288 was listed for sale at around $200,000 according to Mrs. Kir-scher. Plaintiff then considered the only alternative was to sign the proposed contract.
116. Plaintiff’s land sold to defendant, identified in the petition and described by defendant’s appraisal report, consisted of 530.74 acres out of a total ownership of 690.74. The property was located five or six miles north of Townsend on Canton road, and its highest and best use was for grain, hay, livestock production and feeding. The place was served with electricity, telephone and school bus, and water from the Yankee ditch and the Kirscher-Graveley ditch. Virden’s report states in part:
The property included in this appraisal has been in the ownership of the owner’s family since 1888. It is now operated by the owner and two sons. It is located on the west side of the most productive area of the Canton Valley. The soil is a silty and sandy loam, all well drained with no signs of alkalinity or gravel outcroppings.
There is a potential irrigable acreage of at least 400 acres suitable for all types of cultivation. The owner utilizes part for crops to produce grain to fatten livestock, part for tame hay required in the operation and the remainder for native hay and pasture to balance his livestock operation.
The allocation of ample irrigation water rights to this property and the large acreage of potential irrigable land covered by the water rights would exceed the present appraisal when applied to the highest and best use of this land. The remaining river bottom pasture and year around livestock water is also valuable in as much as either a farming or livestock operation, the grass, livestock water and shelter affords a diversification whereby all crops produced can be profitably utilized by having a desirable area for feeding before or during the farming season thereby eliminating feed lots and fencing of crops. Also the natural water and shelter which are more desirable than wells and sheds. This is a balanced operation in its present use.
117. Defendant valued the land proper at $42,091. A valuation of $130 per acre was placed on 180 acres of irrigated cropland and $100 per acre on another 110 acres of land so described. Irrigated pasture of 97 acres was appraised at *289 $45 per acre, 117.04 acres of river bottom pasture at $25 per acre and 26.70 acres of grazing lowland at $15 per acre.
Because the property purchased was used as a unit in connection with property not taken, severance of $3,200 was allowed by defendant on 160 acres at $20 per acre. Buildings were appraised at $6,383, wells at $400, fences $728 and an earthen fill and certain natural springs of nonfreezing water at $498. The total valuation was $53,300. Fair market value of the whole unit was computed at $69,300 and that of the unit remaining after the sale at $16,000. Without the severance the value of the taking area was $50,100. The difference between the appraised price and the contract price is represented by the salvage value of the improvements plaintiff desired to retain for a tenant. Plaintiff received an average of approximately $99 per acre, including severance.
118. Mr. Hibbard, who appraised plaintiff’s property after the sale, did so on the basis of production data, photographs, maps and discussions with plaintiff. He valued it as of July 17,1952, at $81,000, as follows:
40 acres of Grade 1 land @ $400 per acre_$16,000
40 acres adjacent (a little wet) @ $300 per acre_ 12, 000
80 acres of farmable soil @ $200 per acre_ 16, 000
370 acres subirrigated pasture @ $100 per acre_ 37,000
81,000
Hibbard took the three tax returns filed by plaintiff and sons from 1943 to 1951, determined net income and capitalized it at five percent to arrive at a valuation of $144,000. This covered all of the ranch land owned and operated by plaintiff and sons. Splitting this valuation on a 60-40 percentage basis, Hibbard put a capitalized value of $86,493.60 on the property purchased by defendant. He also made a valuation on a share-crop basis and arrived at a figure of $104,200, which plaintiff does not rely on here. All of these valuations by Hibbard consider water rights but not improvements. He characterized the land as similar to, but not as good as, the Gill property nearby and agreed it was a combination crop and livestock operation. He cited, no comparable sales at or near his valuation.
*290 119. Plaintiff and wife bad attended the McCormick meeting at Townsend and quoted him as saying the same price would be paid for the same type of land, a statement they allegedly relied upon. McCormick denies having ever made any such statement but rather that he said the various owners would receive fair market value at the time of the purchase. He relies upon the statement of policy as outlined in full in his letter to plaintiff Kirscher on December 15, 1949, set forth in finding seven, and in which he makes no such statement as attributed to him by the plaintiffs in this case. Plaintiff Kirscher does not cite the examples of any neighbors to support a claim that he received inequitable treatment but did at the trial make reference to the condemnation of the Schreiner ranch, the fact that the district court let Schreiner have a part of the appraised value of the property and contended that Schreiner got more from a jury for his hayland than plaintiff here got for his best land. No figures are cited. The assertion is made that had the facts about condemnation been known plaintiff would have let his property be condemned rather than to have signed the contract. He blames defendant’s agents for misrepresenting the facts about what would happen in event of condemnation. Plaintiff now claims the sum of $28,500, the difference between Hibbard’s appraisal for him and the sum received from defendant.
120. The weight of the evidence is that plaintiff received a price comparable to other properties valued or sold at or near the time plaintiff sold his property to defendant and that such price was then the fair market value. Plaintiff was an intelligent, well-informed citizen, who took ample time to consider defendant’s offer and the consequences of a sale, who refused an opportunity to sell almost two and one-half years before he finally did so, and who was not misled by defendant’s agents.
WILLIAM P. SULLIVAN
121. Plaintiff William P. Sullivan was owner of an undivided one-quarter interest in 397.56 acres described in the petition and is the only owner thereof authorized to pro *291 ceed under tbe congressional reference herein. The lands and the rights in the Irish ditch, in which plaintiff owned an interest, were sold to defendant on April 30, 1952, for the sum of $50,000, the owners reserving the improvements and water rights in the Montana ditch. The other owners were plaintiff’s sisters and the contract was signed by plaintiff, by Mabel Williams, a widow of Townsend, Mary Bradshaw and George Bradshaw, her husband, of Sacramento, California, and by Zella Morris and Arthur A. Morris, her husband, of San Diego, California. The contract was based upon an appraisal by defendant’s agent, Thomas B. Virden, dated April 12, 1952, and referred to more fully hereafter.
122. Defendant’s negotiator, Vernon George, first called on plaintiff on November 17,1949, and made an offer of $28,-373.60 for his property. Plaintiff testified that George told him that was “all anybody is going to get,” and went on to explain about condemnation saying it would take many years and lawyer fees and the owner would not get any money until the case was concluded. Plaintiff said he would have to consult his sisters about the proposed sale and would correspond with some of them who lived out of the state. George returned in two weeks but plaintiff had not heard from his sisters.
123. Subsequently, in 1951, defendant’s appraiser, Virden, showed up and plaintiff went over the property with him and helped him measure the buildings. There was a discussion about the cattle but not about operating costs or income. There was no further contact by defendant’s agents until April 29, 1952, when George returned with an offer based on Virden’s appraisal. George said that he did not return sooner because he was busy on other projects.
124. Plaintiff testified that prior to the visit by George which culminated in the contract, he was visited in April 1952 by Virden who offered him $43,878. This offer was allegedly based on $200 per acre for the “homeland” and $50 per acre for the pasture. Plaintiff said that he complained about this price and the short notice and demanded $50,000, that Virden agreed with him and George returned with a contract for that figure, which was accepted. He also *292 understood that some of the land would not be flooded and represented that Virden said he could have a “perpetual lease” for that portion.
Virden, who denies this evidence, had no authority to make any offers for defendant and neither Virden nor George nor their superiors had any authority to offer any “perpetual leases.” If any such offer was made it was unauthorized. The alleged offer per acre was considerably in excess of the valuation per acre made by Virden and constituting the basis of the contract of April 30,1952. The weight of the evidence is against the plaintiff’s testimony as described in the paragraph above.
125. Virden’s appraisal valued the 160 acres of irrigated cropland at $130 per acre, 120 acres of irrigated pasture at $70 per acre, and 117.56 acres of bottom pasture at $25 per acre, for a total valuation on the land proper of $32,740. This property was four miles from Townsend and enjoyed good farm services such as electricity, telephone, rural free delivery, road, school bus and convenient market facilities. The appraisal report stated in part:
This property is now in undivided fee ownership of the son and three daughters of Marguerit Sullivan. The land consists of one quarter section of choice irrigated farm land with good improvements. Also 320 acres of hay and pasture, 120 acres of which is irrigated and 80 acres of which is potential. 480 acres of mountain pasture and a forest permit.
It is being operated as a livestock unit, well balanced to support 200 head annually. The owners now have about 250 head.
Vm. P. Sullivan is the owner of 160 acres, of irrigable land in Sec. 21-7N-2E being the land upon which the one share of Montana Ditch water is used. Ownership of said share of water was transferred by deed with the appraised property with the intent the said share become the property of ffm. P. Sullivan. This water is not applicable to the appraised property, has never been used on the appraised property and the retention of the one share of Montana Ditch Co. is requested by the Vendors.
126. The defendant allowed plaintiff $4,000 for severance. The entire unit was valued at $57,000 and the part remaining at $5,600. Improvements were valued as follows: build *293 ings $13,466; wells $400; fences $794. The total fair market value; including severance, was computed at $51,400. The difference between the appraised and the contract price represents the salvage value of improvements retained by plaintiff.
in valuing plaintiff’s property at $125.76 average per acre, including improvements and severance, Virden gave consideration to the sales in 1947 of the adjacent properties. One of these was the sale of Zimmerman to Meyer, heretofore referred to, at $106.60 per acre and the other was the sale by the Teague estate to Kane and Iiardgrove at approximately $80 per acre.
Virden testified that he tried, in appraising the property desired by defendant, to put the same price on the same type of land valued at or about the same time but that such prices or valuations would fluctuate $5 or $10 per acre on the same classes of land, depending on the quality of the land itself.
127. Hibbard appraised plaintiff’s property after it was flooded. He based his opinion of its value on his general information and on data supplied to him by plaintiff. His valuation was $83,850 computed as follows: 160 acres at $450 per acre and 237 acres at $50 per acre.
Hibbard considered in his appraisal the use of forest permit ground and the contribution of land not acquired but says he did not consider severance nor comparable sales. He said he knew of no comparable ground or sales but did compare the better 160 acres of plaintiff’s property to that of the Gill estate and Herb Gill with respect to which findings have been made. Hibbard also appraised this property with the capitalization theory. He estimated that the landlord’s share of its profits, less costs, would be $4,091, which capitalized at five percent equals $81,820.
In making his appraisal Hibbard considered that there are 133 frost-free growing days in Canton Valley. The official records recorded at Townsend for the county indicate 110 frost-free days for a 24-year average. This is pertinent to the number of cuttings of alfalfa possible in a season and the corresponding profit likely to be derived therefrom.
128. Plaintiff was not sure that he attended the McCormick meeting or recalled what was said if he was there. He did *294 say that both. George and Virden told him about condemnation, which they deny. He had never been involved in a lawsuit and did not want to be. He testified that his fear of condemnation and the delay and cost thereof as described by defendant’s agents and his understanding that he could get a perpetual lease on any land bought by defendant and not flooded “softened him up for the sale.” He sought no legal advice nor did he have Ms property appraised prior to its sale although he said he did not consider the price offered by defendant as a fair price. Plaintiff received from defendant the price he says he asked for his property but now relies on the valuation by Mr. Hibbard. Plaintiff claims $33,850, the difference between tMs valuation and the sum received from defendant.
Plaintiff’s property was appraised by defendant in line with other and similar property appraised at or about the same time. Plaintiff was not misled by defendant’s agents and received the fair market value of his property at the time of its sale.
MARY M. PROSSER
129. On May 8, 1952, plaintiff Mary M. Prosser sold 324 acres of land in Broadwater County, Montana, described" in the petition, to defendant for the sum of $45,000, including water rights but not the improvements. The sale was negotiated for defendant by Vernon George. Plaintiff’s son who was living on the property, was permitted to remain on it until the water came up in 1954 and defendant charged no rent.
Plaintiff learned in 1950 or 1951 from defendant’s appraiser, Virden, that she would have to sell. However, it was the desire of plaintiff and her husband that no sale be made, regardless of price, until absolutely necessary. There was a possibility that if a lower dam was built the property might not be flooded. Accordingly, no offer was made to plaintiff at this time.
On March 31, 1952, Virden told plaintiff that clearing contracts were to be let in May and it would be necessary for him to appraise the property. He made an appraisal on April 15, 1952, more fully described hereafter, and George offered the full amount of that appraisal to plaintiff who *295 accepted it, as noted above. The contract was offered to her on May 7,1952, but in the absence of Mr. Prosser she would not sign it.
130. Plaintiff testified that in April 1952 she was told by Virden that her property was in the category of that for which defendant was paying $100 per acre and that she refused to consider selling at such a price. She said she wanted $65,000. Plaintiff alleges that Virden later offered her $33,000 which she rejected. Subsequently, plaintiff alleges that George offered her either $36,000 or $38,000 which she rejected. She alleges, further, that George offered her $13,000 which she rejected. Finally, the offer of $45,000 was accepted by plaintiff who testified that she was persuaded to accept it for several reasons. She said that the property of one of her neighbors had been condemned and that George threatened her with condemnation and said it might take 30 years, during which time she would not receive any money at all for her property. George denies this. She had never been involved in a lawsuit and did not wish to be. She said she believed the Government agent. She was 73 years of age and did not think that she could wait 30 years for her money and was “scared.” Subsequent to signing the contract, however, plaintiff said she learned George’s alleged statements were untrue and that different prices were being paid by defendant for similar land. She cited the Gill estate and the Frank Wieferich sales, which, as previously noted, were in 1953 and testified that they got $300 per acre for land and that Gill’s was just across the road from hers. These two parties received $250 per acre for irrigated cropland, not including improvements. She also cited the case of John G. Plymale and said that defendant raised its first offer of $80,000 to him to $142,000 in six weeks. In fact, the first offer to Plymale was for $88,000 on September 30, 1950, and the sale at the higher figure was on March 11, 1952. In the meantime, there was a reappraisal. Plaintiff also cited the Schreiner condemnation case and said that it did not take Schreiner as long to get the money as George had represented would be true in a condemnation case. She said her decision to seek relief here came after the trial in the Schreiner case and after the trial of the condemnation *296 actions against Daniels and Hahn, all of whom got more than defendant had offered for their property. She now relies on the appraisal of her expert, Hibbard.
131. The only appraisal of plaintiff’s property which' defendant’s agents admit they made is in evidence. It was made by Yirden on April 15, 1952. He said that he discussed it with Mr. Prosser and John Plymale, plaintiff’s son. Plaintiff claims that she did not know Yirden was an appraiser and that he did not ask her for any information. Yirden did not have any authority to make any offers or try to negotiate any sales and denies having done so. George had no authority to make appraisals and denies having done so or having made any offer except the one accepted and denies, as does Yirden, making the statements about condemnation attributed to them by plaintiff.
The appraisal on the basis of which the offer was made and accepted values 206.5 acres of plaintiff’s irrigated cropland at $130 per acre, 64 acres of irrigated native hayland at $100 per acre and 53.5 acres of river bottom pasture at $25 per acre. Wells were valued at $500, fences at $890, and buildings at $10,027, for a total valuation of $46,000. The difference between the foregoing figure and the contract price represents the salvage value of improvements retained by plaintiff. This property had a new home on it occupied by plaintiff’s son and there were barns and sheds of log construction, old but adequate. Plaintiff purchased the property from the Federal Land Bank in 1941 for $11,000, built the house, dug wells and improved the property. The property was paid for in five years. It was supplied with ample cheap water from the Yankee and Graveley-Kirscher ditches. The property was about five miles north of Townsend and enjoyed adequate farm services. Defendant gave consideration to the sales of Zimmerman to Meyer and the Teague estate to Kane and Hardgrove in 1947.
No severance damage was allowed. The defendant’s report contains the following explanation:
The subject of severance was discused with William Prosser, the owner of the remaining property. He said the property of Mary Prosser was a separate operation set aside for John A. Plymale, son of Mary Prosser and operator of the Mary Prosser property.
*297 The William Prosser property is a balanced operation and is not dependent upon the Mary Prosser property. The operation of the Mary Prosser property is not dependent upon the remaining property and it is the opinion of the appraiser that being two separate operations, no loss in value of the remaining property, after the taking, has resulted. It is an independent balanced operation under a separate management.
132, Hibbard examined plaintiff’s land after the contract was signed but before flooding. He studied plaintiff’s records and made tests of the soil and prepared a map of the land. His determination of market value was as of March 15, 1954. He determined that $79,221 was the fair market value of plaintiff’s property at that time. Hibbard gave no consideration to improvements.
Hibbard studied plaintiff’s production records over a 16-year period and the market prices in the Townsend area for the years 1950 to 1954, which includes in part a period after the sale. He concluded that a landlord’s share capitalized at five percent would yield the valuation he sets. He then estimated that 214.3 acres of plaintiff’s land should be valued at $350 per acre, 22% acres of hayland at $100 per acre, 8 acres of wet land at $50, and 52.5 acres of river bottom pasture at $30. There were 26.7 acres of wasteland of no value. By variations of capitalization he arrived at a valuation of $85,040. He treated the property as a unit but did not allow any severance. Hibbard gave no consideration to other sales.
133. Defendant’s appraisal of plaintiff’s property was in line with its appraisal of similar properties at or about the same time, and the offer it made which plaintiff accepted represented fair market value on the date of sale, May 8, 1952. Plaintiff’s valuation is unrealistically high and not based on values in 1952.
The weight of the evidence is that plaintiff was not stampeded or high pressured into this sale by the acts and representations of defendant’s agents. Plaintiff knew she would have to sell or that her property would be condemned and the situation was a matter of prolonged study by plaintiff and extensive consultation with defendant’s agents before an acceptable price and valuation was agreed upon and plain *298 tiff elected to sell ratber than, go through condemnation. She was satisfied until she learned the outcome of the condemnation cases referred to above. The allegation that plaintiff was led by defendant’s agents to believe that a condemnation case might take 30 years is found to be patently absurd, for no intelligent person could have believed and no intelligent agent of defendant would have made such a statement. Plaintiff is an intelligent lady of strong character and determination and deliberate in her demeanor. Defendant’s agents were intelligent and honorable. Plaintiff had plenty of time to investigate any representations made to her by defendant’s agents. ■
JOSEPH E. MEYER
134. On May 14,1952, plaintiff Joseph F. Meyer and wife, Agnes, sold 240 acres of land in Broadwater County, Montana, to defendant for the sum of $36,000, plaintiff reserving his improvements which under the contract he was not required to remove before December 31, 1953.
The sale was negotiated by Vernon George who first visited with plaintiff on February 20,1950, and offered him $28,000. Plaintiff rejected this offer. George advised plaintiff that he might not be back for a year or two and plaintiff told George that he would just as soon never see him again. George and plaintiff, however, did meet again to make the contract at the office of plaintiff’s lawyer in Helena. Mr. Virden was not present.
It is plaintiff’s testimony that late in 1951 defendant’s appraiser, Virden, looked around his property and offered him $32,000 which was rejected. Plaintiff testified, further, that Virden came back several months later and offered plaintiff $35,500 with the advice that if it was not accepted the property would have to be condemned. Plaintiff told Vir-den that he wanted $40,000, but would take $36,000. He sold out at this price, moved to town and retired.
135. Virden had no authority to make any offers or negotiate but did discuss with plaintiff the valuation of his property, although plaintiff does not feel he made any appraisal of it and says he did not ask him for any information. It is a fact they did not discuss plaintiff’s income or operating *299 costs. Virden’s appraisal report in evidence dated May 13, 1952, values 157 acres of irrigated cropland at $130 per acre, 54 acres of irrigated native bay pasture at $100 per acre, and 29 acres of other pasture at $25 per acre, for a total valuation on the land proper of $26,535. Buildings were valued at $8,593, wells $400, fences $874, and a road and auto gate $598, for a total valuation of $37,000. The difference between the appraisal and the contract price is the salvage value of improvements plaintiff retained.
Plaintiff Meyer’s property was eight miles north of Townsend with irrigation from the Yankee ditch and Montana ditch. It was adjacent to the properties of plaintiffs Ma-honey, the Plymales, and W. J. Gaab. Satisfactory farm services were available. Plaintiff purchased the property on January 3,1947, for a consideration shown on the records as $14,000 although plaintiff says he actually paid $25,000 in 1919. The date of plaintiff’s acquisition of it is further confused by Virden’s report which states:
The owners of this property have lived on the property and operated the property since acquiring it about 20 years ago. The purchase of the property has been made entirely from the income. The owner has raised beets, grain and hay as well as operating a small dairy.
The property has been well kept and is in very good state of repair. The land has been well utilized and the rotation of crops has maintained maximum production.
The physical condition of the property has not been neglected. All of the improvements, fences, ditches and farming are well cared for at the present time.
136. In considering comparable sales defendant gave weight to plaintiff’s purchase of the property at an average price of $58.33 per acre in 1947. The price received from defendant in 1952 averaged $150 per acre. Consideration was given also to a sale from Walter D. and Viola M. Bagen to Jack Welsh for $143.75 per acre in 1948. This farm was described as an irrigated farm four miles south of plaintiff’s with 148 acres of cultivated land and ten of pasture. The cultivated land was appraised at $110 per acre and the pasture at $15. The water rights do not appear to have been similar to plaintiff’s. Defendant’s *300 appraisal of plaintiff’s land, as will be seen by reference to findings pertinent thereto, was very similar to that of Sullivan, Kirscher, Prosser and the Plymales which were reappraised and sold at about the same time. Plaintiff’s land was appraised at slightly more than the Mahoney land to which it was similar. However, the Mahoney ranch was a little run down because rented in recent years and it would require an expenditure of capital and labor to bring it up fully to the value of plaintiff’s. It is also noted that the Mahoney sale was over a year earlier.
137. Hibbard appraised plaintiff’s property after it was flooded. He had been on adjacent property of the Ply-males prior to the flooding and saw part of plaintiff’s property over the fence. Plaintiff provided him with further information to use in determining a valuation. He appraised plaintiff’s property as being worth $76,500 on the date of sale. This was determined on an acreage basis as follows:
150 acres at $430 per acre
50 acres of wet pasture at $200 per acre
40 dry acres at $50 each
This is the valuation now relied on by plaintiff, which is $500 less than stated in the petition.
Mr. Hibbard also capitalized plaintiff’s income based on information plaintiff furnished about his production from 1945 to 1949. He concluded that a landlord’s net share would have been $3,734.03 which capitalized at five percent would result, in a valuation of $74,680. Hibbard said there were no comparable sales.
138. Plaintiff testified that he knew about condemnation as a result of attending the McCormick meeting and does not charge that defendant’s agents threatened him with it to induce a sale. He now relies on Hibbard’s appraisal and seeks $40,500, which is the difference between that appraisal and what plaintiff received from defendant, and which is $500 less than stated in the petition.
Plaintiff cites the Wieferich and Herbert Gill sales- as being far apart in price although the same kind of land and improvements was allegedly inyolved. He says this is an illustration of how unfairly defendant treated plaintiffs and *301 did not pay the same price for the same kind of land. This matter was explored fully in finding 40 and elsewhere. Plaintiff testified, however, that the Wieferich land was better than his own.
The weight of the evidence clearly shows that defendant’s valuation of plaintiff’s property was in line with others in the area made at or about the same time and that it represented fair market value at the time of sale. Plaintiff was not induced to sell by reason of any misrepresentations by agents of defendant.
ULTIMATE RINDING AND SUMMARY
139. The 19 plaintiffs, who filed a petition pursuant to the rules of the court and a resolution of congressional reference, are claiming a total of $712,458.97. Plaintiffs have already received $653,535.50 from defendant. They allege the sum of these two amounts would represent the fair market value of their respective Montana properties sold to the defendant between September 17, 1949, and May 14, 1952, for the Canyon Ferry reservoir project authorized by Congress. Defendant also purchased properties of others who are not plaintiffs and some lands also not involved here were obtained by condemnation.
Defendant paid the fair market value at the time of sale for the various properties bought from plaintiffs. Prices paid were also comparable as between plaintiffs to the extent of sales made at or about the same time for similar lands. Plaintiffs were offered the full appraised price set after appraisal by qualified agents of defendant. Some plaintiffs elected to take this price less the salvage value of improvements they desired to retain! The plaintiffs now contend that these agents of defendant induced them to sign contracts of sale by willful misrepresentation of the facts. This allegation has been treated in connection with findings on each individual claim. In summary, it is not supported by the weight of the evidence.
Plaintiffs also contend that the appraisals were inadequate. Those appraisals which constituted a basis for offers by defendant, and accepted by plaintiffs, are in evidence. They show attention to the factors necessary to determine *302 current market value and to constitute a basis for expert opinion as to such, value. It is a fact, however, that defendant’s appraisers generally reached their determinations as to value by minimum contact with the owners, which has led to misunderstanding and dissatisfaction with their procedure. Not always were the actions of the appraisers in this connection fully in compliance with instructions of their superiors. Even so, defendant’s appraisers had a better opportunity than plaintiff’s appraisers — who for the most part were called into the case only after the land was flooded— to acquaint themselves with the properties, and their appraisals and opinions based thereon are found to be more realistic and entitled to greater weight.
The plaintiffs herein knew about the possibility of the construction of the reservoir since seeing local publicity relating thereto on May 21,1942. Many of them had inherited their properties from forebears who were pioneers in the state. These were good properties and plaintiffs did not desire to sell. Sales of land in Canton Valley were infrequent. The prospect of the dam also depressed the likelihood of sales in the area to be flooded.
Most of the plaintiffs in this case either attended or heard about a meeting with defendant’s agents in April 1949, prior to any sale herein. The meeting was held in order to ascertain the procedure defendant proposed to follow in acquiring the properties. There is also evidence of some correspondence on the subject with defendant. Plaintiffs knew that they were going to have to sell or that their land would be condemned. This was explained at the meeting but the procedure of unfriendly condemnation was not. The defendant’s negotiators were instructed not to “high pressure” any landowner and to avoid all reference to condemnation if possible. If a landowner specifically asked a negotiator about condemnation the negotiator was instructed to inform the landowner that the Bureau of Reclamation would not meet asking prices to avoid condemnation and to explain the procedure to the landowner whereby just compensation is determined by a jury, in a court of competent jurisdiction, in case the owner and the Government failed to reach an amicable agreement. Some of the plaintiffs did inquire and some *303 did not but they were uniformly anxious to avoid any expense and delay that might arise from litigation. Yet, few of the plaintiffs took the elementary precaution to seek legal advice about the cost or time likely to be required by such proceedings. They testified that defendant’s agents said that condemnation would be prohibitively costly and take up to 25 or 30 years, during which they would be without funds to replace their property. Those plaintiffs who so testified said that they accepted this information as the truth because it came from Government agents. Their representations are greatly exaggerated and lacking in credibility. These plaintiffs are intelligent citizens, well able to defend their rights and not hesitant in their expression of what they are believed to be. Some of them did seek legal advice and independent appraisals of their property prior to sale but nevertheless sold at defendant’s price. Over half of them rejected defendant’s initial offer and obtained reappraisals and increased offers, ranning the risk of condemnation in the meantime. Actions of these plaintiffs were not those of frightened or intimidated vendors. Those who held out and sold at dates subsequent to the first offers made to them got more money, proportionately, for comparable property than those who accepted defendant’s first offer. Defendant, except in the Neild case, did not increase its offers to approximate asking prices. The offers were increased due to changing economic conditions. Defendant did not make offers at the same time to all of the owners whose lands it sought. The offers and reappraisals were strung out over about five years. The result of this policy, and of refusal of some owners to accept initial offers, was that defendant did not pay the same price for the same kind of land. On No. 1 irrigated cropland, for instance, defendant in 1949, 1950 and 1951 paid $125. It paid $125 and $130 in 1952 and $250 per acre in 1953. Thirteen plaintiffs sold various amounts of such land in the first three years, six in 1952, and the Mary Gill estate and Frank Weiferich, not plaintiffs here but landowners in Canton Valley, sold in 1953.
In appraising the properties acquired for this reclamation project the defendant did not rely upon the U. S. Department of Agriculture index of average values of land and *304 buildings per acre in Montana. This index, a defendant’s exhibit, demonstrates that there was an increase in land values in Montana from the date of the first appraisal of plaintiff’s property in May 1948 to November of that year, after which there was a decline of 20 percent to March 1950. Plaintiffs Christie, Beatty, Hardgrove, Gill, Merritt, Blakely, Johnson, Brenner and Biley sold during this latter interval but had the benefit of appraisals made during the period of rising values, which were the basis for the contract price. From March 1950 to November 1952, during which the other plaintiffs sold out to defendant, the index shows a gradual increase amounting to 30 percent. From the latter date there was a decline so that by March 1953 there was a drop of 12 percent from the high point in November 1952. Notwithstanding this fact, defendant paid more for comparable irrigated cropland in March 1953 than at any earlier date, as noted above. Actual prices paid to plaintiffs during the period of the 30 percent increase show an increase but not of this amount. Biver bottom pasture prior to 1952 was bought by defendant for prices varying from $15 to $20 per acre. In 1952 defendant paid around $25 per acre but good irrigated pasture went up from a top of $25 per acre in 1949 to $50 and $60 in 1951, and $100 per acre in 1952 and 1953. Of the land purchased from plaintiffs, approximately 4,900 acres represented pasture and grazing land of various types and acreage occupied by buildings, and 3,600 acres were irrigated cropland.
Three of the landowners, not plaintiffs here, refused to sell to defendant and their lands were condemned. They got, as a result of court action, considerably more than defendant had offered. This caused the plaintiffs in this case to feel that they were penalized for their cooperation with defendant, regardless of whether they accepted defendant’s first offer or later increased offers which were less than they might possibly have obtained as a result of condemnation or less than their experts figure they should have received, based on their appraisal of the properties by methods described in detail in these findings.
Landowners had been advised at the meeting in April 1949 that defendant would adjust its appraisals up or down *305 as economic conditions warranted. At that time plaintiffs were fearful that land prices might go down but the reverse happened, as indicated above. Plaintiffs, some of whom sought to replace their properties with funds received from sale to defendant, found themselves unable to do so on any comparable basis. This was due to the scarcity of comparable land in the area, to the steadily increasing land values and, in part, to the delay between the time contracts were signed with defendant and the date that the owners received payment. This latter fact was usually caused by some minor defect in title which had to be cleared up. Plaintiffs were required by the contracts to furnish defendant with good title.
It cannot be ascertained with any degree of precision from the record just how much, percentagewise, land values increased during the period when defendant was making purchases from plaintiffs. Plaintiffs say that the fact that subsequent offers to some of them, and to other owners not plaintiffs here, were higher than original offers, indicates that the original offers were too low when made and that market values did not increase after 1951. This does not follow. Plaintiffs also contend that land values in the area adjacent to the flooded area but in the same county increased 3.62 percent during 1943-1951, based on sales between 1938 and 1954. They say that this was due to an influx of farmers from other states and that plaintiffs, except for the depressing effect of the prospective reservoir, would have enjoyed a similar increase in the value of their properties which should have been reflected in defendant’s appraisals and offers.
Defendant says that the increased market values through these years were due either to this arrival of new farmers wanting to buy land or to the Korean War or to both, but denies that it was an increase as high as plaintiffs allege. Defendant points out that plaintiffs’ theory is based on years both prior to and subsequent to the sales in issue here, although used by plaintiffs to attempt to show the value of their land on intermediate dates, and is based on properties under different irrigation ditches and otherwise not comparable. Defendant considered sales regarded as comparable ip *306 making its appraisals. These are identified in the findings of fact. Defendant’s own purchases in the flooded area recognize that land values increased during the period of its land acquisition program for the project. It is found that, absent severance and improvements, for which we have no reliable yardstick, values of land proper in the area concerned doubled during the period covered by the purchases by defendant for this project. Some landowners got the benefit of this increase or a part of it and others, who sold out in the early years of the land acquisition program, did not. The facts are found in connection with each individual claim.
Defendant’s delay in effecting sales all at the same time was due, in part, as noted above, to its failure to make offers simultaneously in the area, to refusals of some of the plaintiffs to accept initial offers, and to title defects. Defendant’s long delay between some initial and second appraisals and offers was due to the pressure of business in other areas needing attention of its appraisers and negotiator, to the fact that the land was not immediately needed, to a controversy over the height of the dam, a temporary legislative restriction and, perhaps, to other causes not of record. Plaintiffs suggest negligence, which can only be inferred.
During the period of purchase of properties for the project defendant altered its policy about letting those who sold lease back the property for use until the lands were about to be flooded. At the beginning, those who sold were given a preference in obtaining such a lease at nominal cost. Eventually, no rent at all was required of other plaintiffs who were permitted to remain on their properties after sale. Condemnees were initially refused leases but later were given an opportunity to bid on them and in at least one case of record the condemnee got the lease. The initial policy of leasing back only to those who agreed to sell to defendant, and not to those defendant had to condemn, had the effect of encouraging the earlier sales rather than resort to legal remedy.
There remains the question as to what the fact is as to plaintiffs’ allegation that McCormick at the April 1949 meeting told plaintiff W. J. Gaab, and others, that the de *307 fendant would pay the same price for the same kind of land. McCormick denies making such a statement. It is not a part of the memorandum made by Ebersole of what was said and done at the meeting. It is nowhere stated in the correspondence McCormick had with plaintiff Kirscher. However, it seems likely that defendant would have taken such a position. It is logical. However, it is clear that McCormick warned that prices would be adjusted up or down with economic conditions. That unchallenged fact is a clear qualification to any alleged statement that the same price would be paid. Such a price was, in fact, paid to those who sold at or about the same time, for as to these there were only minor variations in price due to a difference in quality of land. Neither party, apparently, expected land values to rise so sharply or to rise at all. Neither party may have anticipated that it would take so long to buy and sell these properties. It was mainly this lapse of time and change in values that caused the trouble which brings plaintiffs into court. The delay is, in part, as stated above, the fault of a majority of the plaintiffs themselves. They resisted initial offers, had title defects, etc. In part, the delay was due to failure of defendant to push an effort to buy up the area to be flooded, instead of stringing it out over several years.
140. ^Representative Lee Metcalf conducted hearings in Townsend, Montana, October 15, 1953, at which time many of those who are plaintiffs in this case testified. A transcript was made of this testimony. The witnesses were not under oath. There was no cross examination. The hearing was informal and, as stated by the Congressman, “The purpose of this hearing is for my information and of my colleagues in the Congress. It is not a trial. There will be no decision, merely an opportunity for the people of Broad-water County to present for the record some of the complaints that they have already presented to me and to my staff.” Exhibits were received and this record was transmitted to the court by Congress. It has been carefully examined. To the extent that the allegations by either party contained therein are supported by the evidence they have been incorporated in the foregoing findings.

 Several letters were exchanged between plaintiff Kirscher and Mr, McCormick relating to how the properties to be acquired would be appraised. They are referred to in the hearing before Congressman Lee Metcalf but were not offered in evidence at the trial, except for the one above. Nevertheless, they have been examined and are of the same purport.

 The plaintiffs in this ease will be considered largely in the chronological order of their sales to defendant, rather than in the numerical order stated in the petition. Where a slight change in chronological order is made it is in order that similar lands or circumstances can be considered together for clarity. For convenience of reference, findings relative to each plaintiff commence on pages as follows: _
George H. Christie Estate_ 219
George Milton Beatty_ 224
William R. Hardgrove_ 229
Herbert W. Gill-237
Jerome C. Merritt_ 242
Mrs. Robert (Ruth) Blakely. 244
Mary C. Johnson Estate_ 245
Jessie C. Riley_ 250
Ruth McMahon Brenner_ 254
W. J. Gaab_ 259
Mrs. Edwin D. Neild_ 263
D. E. Mahoney_ 269
Carroll G. Eilson_ 272
H. C. Plymale_ 2.75
John G. Plymale_ 281
W. G. Kirscher_ 28'6
William P. Sullivan_ 290
Mary M. Prosser_ 294
Joseph F. Meyer_ 298

 Eleven sales were testifies to but No. 9 was omitted from computation by tbe witness because be felt It was not typical.

 The parties signed an amended contract on September 29, 1959, “to include an omission in the exceptions and to provide an adequate description oí the land.” The amount of acreage and the consideration stated in the contract of December 16, 1949, were not changed.